NORTE & COMPANY, Plaintiff,

v.

R. L. HUFFINES, Jr., Victor Muscat, L. F. Serrick, Alfred O'Gara, Edward Krock and Defiance Industries, Inc., Defendants.

No. 62 Civ. 3390.

United States District Court
S. D. New York.

May 15, 1968.

For supplemental opinion, see D.C., 288 F.Supp. 855.

See also 2 Cir., 416 F.2d 1189.

Milton Paulson, New York City, for plaintiff.

Saxe, Bacon & O'Shea, New York City, for defendants Victor Muscat and R. L. Huffines, Jr.

Hugh P. Mullen, New York City, for defendant Defiance Industries, Inc.

MANSFIELD, District Judge.

This is a consolidated derivative stockholders' suit brought on behalf of Defiance Industries, Inc. ("Defiance" herein), an Ohio corporation formerly named The Serrick Corporation, against certain of its directors for damages for breach of fiduciary duty (first two causes of action) and for violation of § 10 (b) and § 14 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n, and S.E.C. Rule 10b–5 thereunder (third cause of action).[1] Diversity jurisdiction is invoked as to the first two causes of action (breach of fiduciary duty) and federal question jurisdiction as to the Securities Exchange Act claim (third cause of action).

Although five directors of the corporation are named in the action, the only

---

1. The text of these statutes and Rule 10b–5 may be found in Appendix A hereto.

ones served and before this Court are R. L. Huffines, Jr. and Victor Muscat. Edward Krock has been served in a similar action pending in the United States District Court for the District of Massachusetts.

Plaintiff attacks two transactions which were authorized and participated in by the individual defendants, allegedly at Defiance's expense:

(1) The 1962 issuance by Defiance of 487,502 shares of its Class B Voting Stock in exchange for all of the outstanding stock of Insurance and Industrial Enterprises ("IIE" herein), 77% owned by defendants Muscat, Huffines and Krock, pursuant to the said defendants' recommendation valuing the IIE stock at $70.51 per share, which resulted in their acquiring 62% of Defiance's outstanding stock and realizing a profit of approximately $2,304,610 [2] on their own IIE shares; and

(2) The September 6, 1961 acquisition of 10,507 shares of IIE stock (representing approximately 10% of its issued stock) by the triumvirate of Huffines, Muscat and Krock at a price of $20.94 per share, which they then caused Defiance to acquire as part of the aforementioned 1962 exchange at a value of $70.51 per share, realizing a profit of approximately $520,832.

The 1962 exchange is attacked as a self-dealing transaction that was grossly unfair to Defiance and its stockholders for the reason that it resulted in Defiance's issuance of stock worth $7,050,759 in exchange for IIE stock worth $4,057,759, suffering a loss of $2,993,000 and thereby enabling the triumvirate not only to acquire control of Defiance but to reap a personal profit of approximately $2,304,610. It is further attacked (the third cause of action) on the ground that approval of Defiance's stockholders for the exchange was secured through false and misleading proxy material in violation of §§ 10(b) and 14 of the Securities Exchange Act of 1934 and S.E.C. Rule 10b–5 issued thereunder.

The September 6, 1961 transaction is attacked on the ground that by acquiring the 10,507 IIE shares at $20.94 per share for themselves at a time when they were about to authorize the acquisition of all of IIE's outstanding stock at a value of $70.51 per share, and by later transferring their IIE stock to Defiance pursuant to the exchange offer at the $70.51 price, defendants deprived Defiance of a corporate opportunity to purchase the IIE shares at the lower price and reaped a profit at Defiance's expense.

Following non-jury trial of the action in February 1968, the Court, after reviewing and appraising the evidence, including testimony of witnesses presented by both sides, finds the essential facts to be as follows:

Plaintiff is a co-partnership consisting of Joseph C. Galdi and Rita D. Galdi. Norte & Co. is a stockholder of Defiance Industries, Inc. and has continuously been a stockholder thereof since 1960. Each of the partners of Norte is a citizen and resident of the State of New York.

Each of the individual defendants is a citizen and resident of a state other than New York, as follows:

| | |
|---|---|
| R. L. Huffines, Jr. | South Carolina |
| Victor Muscat | Connecticut |
| L. F. Serrick | Ohio |
| Alfred O'Gara | Illinois |
| Edward Krock | Massachusetts |

Defiance is an Ohio corporation engaged, among other things, in the manufacture of parts for automotive, appliance, oil well and other industries. At all times involved in this suit its Board consisted of five directors, of whom Muscat, Huffines, Serrick, and O'Gara were members,[3] Muscat holding the office of

2. Defiance's loss was $2,993,000, resulting in Huffines, Muscat and Krock, as 77% owners of IIE, realizing a $2,304,610 profit.

3. A fifth director, Archie O. Joslin, was not named as a defendant.

President and Huffines that of Chairman of the Board. At all times involved Krock was employed by Defiance as a salaried financial consultant. On June 20, 1962 he was added as a sixth director of Defiance. On January 6, 1963, Krock resigned as a director, and on April 29, 1965, he was re-elected a director.

At all times since 1960 the Board of Directors and management of Defiance has been controlled by the triumvirate of Muscat, Huffines and Krock, who prior to 1960 had been associated together in various business ventures, including their acquisition of substantial stock ownership in Defiance itself. By June 1960 they controlled approximately 33⅓% of its outstanding stock, which was the largest single block, following their acquisition of 20,000 shares from O'Gara, who resigned as Chairman of the Board, receiving a five-year contract as a $15,-000 per year consultant. Prior to June 20, 1962, Krock received $1,000 per month from Defiance for financial advisory services, and beginning in November 1962 this payment was increased to $25,000 per year for his rendition of such services. Mr. Serrick is a salaried officer of Defiance, serving at will and without any contract of employment. For many years Mr. Joslin has been a friend of Huffines, at whose instance he was nominated as a director of Defiance.

In the summer of 1961 the triumvirate of Muscat, Huffines and Krock, together with their associates, owned over 77% of the outstanding stock of IIE, a Delaware corporation formed in January 1960, the principal asset of which was 77% of the outstanding stock of National Bankers Life Insurance Co. ("Nablico" herein), a Texas insurance company. Huffines, Muscat and Krock constituted three out of IIE's five directors, Huffines being Chairman of the Board and Muscat its President. Huffines and Muscat also held the identical positions in Nablico, of which they and Krock were directors.

To summarize, in the summer of 1961 the triumvirate (Huffines, Muscat and Krock) had working control of Defiance (by virtue of their ownership of 33⅓%), IIE (of which they owned 77%) and Nablico (which was 77% owned by IIE). At that time the trio embarked on a scheme to cause Defiance to acquire all of the outstanding stock of IIE (amounting to 99,998 shares) in exchange for shares of Defiance. The effect of such exchange, depending upon the rate of exchange that would be adopted, would be to solidify the triumvirate's control of Defiance by giving them more than 50% of Defiance's issued and outstanding stock. The plan would also result in giving the stockholders of IIE, which was not publicly traded on any exchange, shares of Defiance which were publicly traded on the American Stock Exchange; and it would also serve to give additional security to certain unsecured IIE notes in the sum of approximately $350,000, which were held by the individual defendants and their associates, as well as to a debt in the sum of $96,750.50 owed by IIE to United Metals Corp., wholly owned by Muscat.

Since the triumvirate controlled the corporations involved in the proposed exchange, it could not be an arm's length transaction. As a basis for the exchange Muscat retained the firm of Hayden Stone & Co. to appraise the relative values of Defiance and IIE and to recommend a rate of exchange. On June 30, 1961, Hayden Stone rendered its written report, recommending an exchange ratio based on its evaluation of the underlying assets of both companies. Its appraisal of IIE turned principally on the value to be attributed to IIE's 77% owned subsidiary, Nablico, which was IIE's principal asset. Hayden Stone based its appraisal of this asset largely on unaudited earnings of Nablico for the period from 1956 to 1960 (the most important years being 1958 to 1960), which was supplied to it by Nablico's Comptroller, John P. Redwood, who testified that he arrived

at the earnings figures through use of his own admittedly arbitrary adjustments of certain key items (S.M. 417). Substantially the same unaudited Nablico earnings figures were later submitted to Defiance stockholders in the proxy material which solicited approval of the proposed Defiance-IIE exchange, but were not adopted by Peat Marwick Mitchell & Co., a nationally known accounting firm, when it later audited Nablico's books for the years in question in accordance with generally accepted accounting principles, and arrived at very substantially lower earnings for the same years.

Accepting with only minor changes the unaudited earnings figures thus furnished to it by Redwood of Nablico, Hayden Stone capitalized the average of these earnings for the years 1958 to 1960, using both a 14-times and 15-times earnings ratio for the years 1958 to 1960, and adding 25% as a premium for IIE's control of Nablico, which resulted in its placing a value on Nablico's outstanding stock of between $8,392,613 or $72.90 per Nablico share, and $8,-991,266 or $78.10 per Nablico share. In addition, although the actual book value of Nablico's assets was $1,490,000, Redwood adjusted the book value upward to $10,950,000 (including 25% additional value for controlling interest), or more than seven times the figure shown on its books, to arrive at a book value of $76.55 per Nablico share which was furnished to Hayden Stone and used by it in evaluating IIE's shares of Nablico stock.

The Hayden Stone report, dated June 30, 1961, used the above-mentioned figures submitted by Redwood to appraise the total IIE assets as ranging from $6,751,685, or $67.52 per IIE share, to $7,350,338 or $73.50 per share, an average of $70.51 per share, which was recommended as the basis for exchange with Defiance's stock at $14.49 per share. This appraisal resulted in an exchange ratio of 4⅞ shares of Defiance Class B Common Voting stock for each share of IIE stock, or 487,502 shares

of Defiance stock for 99,998 shares of IIE stock, which was adopted by Defiance's Board of Directors on September 12, 1961, as the basis for an exchange that would be submitted to Defiance's stockholders for approval. Present and voting in favor of the recommendation at the September 12, 1961 Defiance Board meeting were Huffines, Muscat, Serrick and O'Gara. The exchange offer was promptly accepted by every stockholder of IIE, each agreeing to tender his IIE shares at the proposed ratio. However, due to difficulties and delays in obtaining SEC review of the proxy material to be sent out to Defiance's stockholders, the cutoff date in the agreements between Defiance and IIE expired and the agreements lapsed.

In the meantime on September 6, 1961, although the proposed exchange ratio placed a value of $70.51 on the IIE stock to be acquired by Defiance, the triumvirate (Muscat, Huffines and Krock) purchased 10,507 IIE shares from Andrew D. Griffith, then a director of IIE, for $20.94 per share in an arm's length transaction which was negotiated in hard bargaining fashion over a period of some weeks. These 10,507 shares represented more than 10% of IIE's 99,998 outstanding stock. The transaction was consummated more than two months after submission of the Hayden Stone report of June 30, 1961, and one week prior to the adoption by Defiance's Board of the resolution recommending its acquisition of all of IIE's stock (including the 10,507 shares) at a value of $70.51 per share. Since the triumvirate controlled Defiance's five-man Board, the inference is irresistible that at the time of the purchase of the 10,507 shares from Griffith, i. e., on September 6, 1961, the triumvirate were well aware that the proposed exchange would be approved by the Board for submission shortly to Defiance's stockholders.

Although the negotiations for purchase of the 10,507 IIE shares from Griffith were handled principally by

Krock and took the form of a transfer of the shares from Griffith to Krock who in turn transferred 3,502 IIE shares to Huffines, 1,751 shares to Muscat, and 1,751 shares to Muscat's mother, and retained 3,503 shares for himself, the evidence is clear that Krock was acting on behalf of the triumvirate in making the purchase. The three had been associated together in various ventures over a period of several years. In the spring of 1960, for instance, acting as a group they had acquired their one-third interest in Defiance. They had likewise acted together in the formation of National Bankers Investment Co. ("NBIC" herein), the predecessor of IIE, which they formed to acquire control of Nablico. Huffines, who had known Krock since 1945 in various business dealings (some involving Muscat), brought in Krock as a partner in the IIE venture. From this close joint association in numerous prior similar ventures, it must be inferred that the triumvirate were acting together in the immediate transaction and a sufficient foundation was thus established to permit introduction of Krock's own testimony to the effect that in negotiating with Griffith for the purchase of the 10,507 IIE shares, Krock was acting for the group consisting of Huffines, Muscat and himself, and that he confirmed the deal with Griffith only after telephoning Huffines and Muscat and obtaining their approval. Krock's agency for the group is further confirmed by his letter to Griffith dated August 16, 1961 to the effect that if he purchased the IIE stock he would offer his shares to his "partners," referring, of course, to Muscat and Huffines, and by the further fact that within a few days after acquiring the 10,507 shares from Griffith for $20.94 per share he transferred a one-third interest each to Huffines and Muscat, respectively, at his own cost price of $20.94 per share.

Even if defendants' contention that Defiance lacked cash to take advantage of the corporate opportunity offered by Griffith had legal validity, which is doubtful, Irving Trust Co. v. Deutsch, 73 F.2d 121 (2d Cir. 1934); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928), there is insufficient proof to support it. There is no showing, for instance, that the opportunity was ever offered to Defiance, much less rejected by it for lack of cash. Defiance's balance sheet reveals that it had current assets of more than $3.2 million shortly prior to the transaction, including almost $1 million in cash and $1 million in net current receivables, against total current liability of approximately $2 million. In May and June 1961 Defiance apparently had had no difficulty paying a total of $1,194,300 in cash for 320,000 shares of Utronics Corp. Compared with such an acquisition the $220,000 required to purchase 10,507 IIE shares from Griffith would have represented but a modest outlay.

The Court also rejects defendants' contentions (1) that the Griffith-Krock transaction represented a distress sale by Griffith, and (2) that Krock paid additional consideration to Griffith by giving up an option to participate with Griffith in a Florida hotel venture. It is true that Krock did pay part of the $220,000 purchase price by cancelling Griffith's outstanding note held by Krock in the sum of $100,000 (due November 15, 1961), given earlier in the year against an advance in that amount by Krock to Griffith to acquire a Florida hotel property. However, Krock was not pressing Griffith for payment of the note. On the contrary he was willing to extend the note indefinitely and it was Griffith who sought to discharge the obligation in advance of the due date, which was November 15, 1961. As for the so-called "option" it amounted to no more than an offer by Griffith to Krock to participate in the Florida hotel venture, which Krock refused. There is no evidence that the opportunity to participate in the venture had any value. As far as the record is concerned, it may have involved Krock in liabilities.

The triumvirate's purchase of 10,507 IIE shares on September 6, 1961, for

$20.94 per share not only represented a corporate opportunity that should have been offered to Defiance, but it also evidences the gross unfairness of the defendants' recommendation that Defiance purchase all of IIE's stock (including the 10,507 shares) at a value of $70.51 per share, since it reveals that in their own dealings these knowledgeable buyers and seller (Griffith), each of whom was aware of the figures in the Hayden Stone report, did not honestly believe that the report, and the unaudited figures furnished as the basis for its appraisal, fairly stated the value of the outstanding stock of Defiance and IIE. For instance, when the Hayden Stone report was advanced by Griffith and his representative Pruitt as the basis for evaluating IIE stock, Krock advised them that the report showed a "grossly inflated value" for the IIE stock, and that it contained "flaws." Likewise Huffines advised Griffith that the report was "not reliable" and could not be used as the basis for evaluating IIE stock. Despite the Hayden Stone report and Griffith's initial demands for a higher price, the parties, after hard bargaining, finally arrived at a price of $20.94 per share which both Muscat and Huffines considered to be a fair price.

At the time of the purchase of the 10,-507 shares at $20.94 per share, the book value of the IIE stock was approximately $21.00 per share.

Notwithstanding the fact that the trio had thus acquired 10% of IIE's outstanding stock at $20.94 per share, Huffines and Muscat proceeded with their recommendation to the stockholders of Defiance that all outstanding IIE stock, including the 10% just purchased by them, be acquired pursuant to an exchange arrangement which valued the IIE stock at $70.51 per share, and on September 12, 1961 (six days after the purchase of the 10%) Defiance's Board adopted the resolution recommending the Defiance-IIE exchange on such a basis.

Because of delays in obtaining SEC review of the necessary proxy material, the Board's September, 1961 recommendation could not be implemented prior to the cut-off dates agreed upon by the parties. Accordingly, on May 15, 1962, Defiance's Board, including Muscat and Huffines, called a meeting of its stockholders to be held on June 20, 1962, to approve the proposed exchange at the original ratio and original $70.51 per share valuation placed on the IIE stock.

On May 28, 1962, pursuant to the aforementioned recommendation, Defiance's Board caused an 80-page detailed proxy statement to be issued recommending the exchange to Defiance's stockholders at the ratio of one share of IIE stock for 4⅞ shares of Defiance stock. A great deal of the mass of detail found in this proxy statement would be difficult, of course, for the average stockholder to read, much less to understand. Much of it is devoted to fine print financial descriptions, statements and items peculiar to the insurance business.

Even an intelligent stockholder seeking the true picture would be disappointed, however, for the reason that the proxy statement misstates certain key material facts, and omits others, with the result that it would mislead him into the belief that the exchange ratio was a fair one, whereas he could be led to a contrary impression by disclosure of the actual facts. One of the most serious of these misleading statements arises out of the proxy statement's use of unaudited, inflated earnings figures for Nablico, IIE's principal asset, for the years 1958 to 1960, which were substantially in excess of Nablico's actual earnings for those years, as certified by Peat Marwick Mitchell & Co. after audit for use in Nablico's September 1962 prospectus. The materiality and misleading nature of the unaudited figures, which were furnished by Redwood of Nablico pursuant to Muscat's direction, is evidenced by the fact that substantially the same unaudited, inflated figures were used by Hayden Stone, to whom they were furnished by Redwood, to arrive at an appraisal of IIE's stock at $70.51 per share, through capitalization of Nablico's earnings by use of "times-earnings" multipliers of 14

and 15, and the same distorted figures could be expected to have a similar influence on Defiance's stockholders, some of whom might resort to the common practice of capitalizing earnings to arrive at the value of IIE shares for purposes of determining whether the exchange ratio was fair. A comparison of Redwood's unaudited and uncertified earnings figures for the years 1958 through 1961 with the audited earnings certified by Peat Marwick Mitchell & Co. as being in accordance with generally accepted accounting principles reveals that Peat Marwick found the earnings for these years to be $596,131 less than the earnings represented in the proxy statement:

|  | May 1962 Proxy Statement (Unaudited) | Sept. 1962 Nablico Prospectus (Audited and Certified by Peat Marwick Mitchell & Co.) |
|---|---|---|
| 1958 | $ 486,958 | $ 346,011 |
| 1959 | 673,225 | 388,469 |
| 1960 | 568,417 | 358,800 |
| 1961 | 369,413 | 408,602 |
| TOTAL | $2,098,013 | $1,501,882 |

The differences between the higher unaudited, uncertified earnings figures used by the defendants in the proxy statement and the lower figures certified by Peat Marwick Mitchell & Co. after audit arise for the most part out of the treatment of various adjustments made in later years to earnings for earlier years, as reported to various state insurance departments. Instead of making the adjustments by deduction from the income figures for the earlier years, as dictated by generally accepted accounting principles used by Peat Marwick Mitchell & Co., defendants improperly showed the changes as adjustments to unassigned surplus. Redwood testified that upon learning the final earnings for an earlier year, he followed the latter course for the reason that this was a procedure used in reporting to various state insurance departments. Unlike Defiance's stockholders, however, such departments were more interested in whether assets were sufficient to meet policy claims than in obtaining an accurate statement of earnings for any given year. Since the multistate insurance forms used in reporting to state insurance departments contained no provision for allocating earnings and expenses to proper time periods, as required by generally accepted accounting principles, but were satisfied with a balance sheet, asset-type of disclosure, correction of earnings figures for earlier years was not made but was reflected by adjustment to unassigned surplus.

Stockholders being solicited to approve the Defiance-IIE exchange were entitled to an accurate statement of Nablico's actual earnings for the years immediately preceding 1962, and it was misleading to provide them instead wtih a statement that improperly included substantial and material items as income when in fact these items were not income. If a reasonable difference of opinion existed between accountants as to whether the items constituted income, their treatment as such in the proxy statement might be excusable, provided the stockholders were given some inkling of the diversity of opinion. In this case, however, no such diversity of opinion existed. Irving Kuller, a Certified Public Accountant with more than 30 years experience, a partner in a large and reputable firm of Certified Public Accountants (David Berdon & Co.), testified:

"Q. Does this diversity of opinion also apply in the area of insurance accounting as compared perhaps to industrial company accounting?

"A. The word 'diversity' is something which slows me up in answering the question. I don't know what you

mean by 'diversity.' If you mean that accountants may differ in the determination of whether a particular item of expense or liability should be treated in one fashion or in another, yes, they could have differences of opinion.

"With respect to the items involved in the adjustments of income as certified by Peat Marwick Mitchell, I am not aware of any diversity of opinion with respect to the adjustments they made because their certificate is unqualified and the footnotes to their financial statements do not signify or suggest that a diversity of opinion existed. "

The use in the proxy statement of the method used by Nablico in reporting to state insurance departments, rather than generally accepted accounting principles which required prior-year corrections to be made to earnings figures, not merely to unassigned surplus, was the principal cause of the distortion of Nablico's earnings, accounting for $310,917 of the total inflation of the 1957 to 1961 earnings figures. Thus the item "increase in prior years' life reserves," a correction to life reserves made on the basis of actual end-year experience with claims on life policies as ascertained in the following year, which amounted to $106,389 for 1957, $65,061 for 1958, and $40,000 for 1959, was reported in the proxy statement as a deduction from unassigned surplus rather than as a reduction in net income for the appropriate year in accordance with generally accepted accounting principles used by Peat Marwick Mitchell & Co. Similarly, certain accounts receivable, $63,131 for 1958 and $36,336 in 1960, which were considered uncollectible, were subtracted by Peat Marwick Mitchell & Co. from net income for those years but were reflected in the proxy statement in the unassigned surplus statement, not in the statement of earnings.

The failure to make such adjustments to earnings, as required by generally accepted accounting principles, is all the more glaring a distortion because Redwood, who was responsible for preparation of Nablico's financial statements for the proxy statement, was undoubtedly aware of the adjustments to earnings actually made by Peat Marwick Mitchell & Co. in accordance with generally accepted accounting principles, since he had been working closely with them on various matters including these adjustments from at least as early as 1960.

Other differences between the high unaudited figures used in the proxy statement and the lower figures certified by Peat Marwick Mitchell & Co. do not result from the proxy statement's showing adjustments in the unassigned surplus statement rather than to earnings but from its failure to reflect adjustments to earnings in the appropriate year. A significant example of this type of distortion was the inclusion in 1958 earnings of $197,725 which should have been included in 1957 earnings. This amount represented income from a co-insurance arrangement which was not reported by the writer of the insurance (in which Nablico shared) until after Nablico's 1957 financial statements were prepared. It was thereupon routinely included in 1958 earnings without ever properly crediting it to 1957 earnings, which created the erroneous impression that Nablico's 1958 income was higher than it actually was. Later, when new federal tax legislation on underwriting income made allocation of income between 1957 and 1958 important for tax purposes, Redwood searched Nablico's financial history and "somewhere in 1962" discovered this adjustment in time for inclusion in the September 1962 statements certified by Peat Marwick Mitchell & Co. In view of Redwood's testimony that he commenced working with Peat Marwick Mitchell & Co. on the problems created by the new tax legislation at least as early as 1960, it may fairly be inferred that the "discovery" of this adjustment was made in time for inclusion in the May 1962 proxy statement as well. The omission of this adjustment from the proxy statement, with the resulting erroneous presentation of this item as 1958 rather than 1957 income, is significant

not only because of its magnitude, but also because 1958 was the first year in which Nablico was under the control of Huffines, Muscat and Krock.

Regardless of what may have been the specialized interest of state insurance departments, Defiance's stockholders were entitled, in voting upon the fairness of the proposed Defiance-IIE exchange, to an accurate statement of the earnings of the two companies, especially since such earnings could play an important part in determining the fairness of the exchange ratio. Instead they were furnished with figures that were materially misleading, since they gave the impression that over the four-year period, 1958 to 1961, Nablico's, IIE's principal asset, had earned $596,131 more income than would actually be reflected through the application of generally accepted accounting principles.

The material significance of the difference between IIE's true earnings as reported by Peat Marwick Mitchell & Co. and the inflated, unaudited and uncertified figures incorporated in the proxy statement, is illustrated by the fact that when Hayden Stone's capitalization of earnings formula (14 to 15 times earnings) is applied to Peat Marwick's statement of Nablico's earnings for the years 1958 to 1960 (the same years used in the Hayden Stone report, which formed the basis for the recommendation to Defiance's stockholders), it reveals that Defiance overpaid $3,383,415 in its own stock (at $14.49 per share, as valued by Hayden Stone) for all of the outstanding stock of IIE. Mr. Kuller of David Berdon & Co. testified that application of the identical Hayden Stone formula to the Peat Marwick earnings figures would have required Defiance to issue 254,000 shares of its Class B Common Stock for acquisition of all shares of IIE instead of the 487,502 Defiance shares issued by it, or a differenc of 233,500 shares. To put it another way, use of Peat Marwick's certified statement of earnings for the years 1958 to 1960 would have resulted in an average value of $36.68 per IIE share

instead of the value of $70.51 per IIE share arrived at by Hayden Stone.

In addition to its inflation of Nablico's earnings, the proxy statement contains other misleading items, distortions and omissions, as follows:

(1) *The representation that there was no market in IIE stock when the triumvirate had recently purchased 10% of IIE's outstanding shares at $20.94.* Even if the average stockholder did not attempt to read all of the fine print contained in the proxy statement, one item which he would be most likely to read would be the Board's Recommendations, which are found at page 10. Of obvious central importance to a stockholder deciding whether to approve the exchange at the recommended ratio would be the price at which the shares of each company involved had recently been sold. In the case of Defiance, which was publicly traded on the American Stock Exchange, its market range was not only known to many of its stockholders, but it was set forth by quarters in the proxy statement for the two-year period prior to May 24, 1962. Likewise the over-the-counter price range of Nablico common stock was stated by quarters for the same period. With respect to the price of the IIE stock, however, one finds under the "RECOMMENDATION OF THE BOARD OF DIRECTORS" the following statement (p. 10):

"There is no market for the stock of Insurance and Industrial Enterprises, Inc. since all of the stock of that concern has been held by only a small number of persons."

Turning to that part of the proxy statement headed in block print "PRICE RANGE OF CLASS B COMMON STOCK OF THE SERRICK CORPORATION [Defiance]" and "PRICE RANGE FOR THE COMMON STOCK OF NATIONAL BANKER'S LIFE INSURANCE COMPANY," the price ranges for the shares of these two companies are listed in detail, followed by the statement:

"Since all the stock of Insurance and Industrial Enterprises, Inc. is held by

only a small number of persons, there has been no market for its stock."

If, instead of stating that there was no market at all for IIE shares, the proxy statement had revealed under these headings the fact that within the previous 10 months (and only a few days prior to the Board's first recommendation favoring the exchange) approximately 10% of IIE's issued stock had been sold in an arm's length, hard bargain for $20.94 per share, which was approximately the book value shown on IIE's books, the average stockholder may well have been influenced to conclude that the proposal to issue 4⅞ shares of Defiance, valued at $70.51, for each share of IIE stock was a most unfair exchange from his standpoint.

The vital information—the recent sale of a substantial block of IIE shares for $20.94 per share—was not disclosed in a meaningful location in the proxy statement, where one might reasonably expect to find it. Instead it was buried as a tailend reference under a subheading of a section entitled "DESCRIPTION OF INSURANCE AND INDUSTRIAL ENTERPRISES, INC.", which does not purport to deal with the prices at which IIE stock had been sold in a recent transaction. The subheading, which is entitled "Principal Owners of Stock," purports initially to describe the names of the principal owners of more than 10% of IIE's outstanding common stock and refers to the September 1961 transaction for $20.94 per share only at the very end of the text where it would be least likely to be noticed by a stockholder.

(2) *The failure of the proxy statement to state plainly, as did the Hayden Stone report, that Nablico's declining volume of life insurance had the effect of giving a distorted picture of earnings.* Earnings in the insurance business appear to be less in periods of growth (which involve greater initial acquisition costs) than in periods of decline. Nablico's volume of life insurance had declined from $84 million in 1957 to $58.7 million in 1960, which had the effect of temporarily showing high earnings that did not re-

flect a true picture of its condition. Instead of flatly so stating, as did the Hayden Stone report, the proxy statement engaged in a type of circumlocution that would require an extraordinarily persevering and persistent stockholder to figure out the actual fact. This was accomplished by the device of fragmentation, i. e., separately inserting piecemeal statements with respect to the matter in different locations in the statement. For example, in one location it is asserted generally that in insurance accounting certain expenses are not accrued in relation to the period during which earnings are received and that such prepaid expenses may not be carried as an asset, with the result that when the number of policies being issued exceeds those being terminated, statutory earnings are reduced to the extent of the increase in prepaid acquisition costs, whereas "In a period when the reverse is true, statutory earnings are benefited." The trouble with such generalities is that while they might lead an extraordinarily able and inquiring stockholder to apply them to figures supplied elsewhere in the proxy statement, the average stockholder reading the statement could not be expected to go through such a tortuous and difficult process. The effect was to skillfully mask the overstatement of Nablico's earnings instead of stating plainly that the decrease in life insurance in force had the effect of causing an overstatement in earnings.

(3) *The proxy statement's failure to reveal that a $5,500 judgment had been rendered against Nablico in a suit by two policyholders against it claiming dividends and that substantial amounts were involved in similar claims being asserted by other Nablico policyholders.* Such a statement was made in Nablico's later registration statement of September 1962. However the proxy statement, while stating as a contingent liability that Nablico was a party to six lawsuits involving claims by policyholders, merely asserted that "in the opinion of counsel, the claims are not justifiable," without disclosing that Nablico had already lost

an earlier lawsuit involving such claims and that additional claims for substantial amounts could be anticipated if the six pending suits were not determined favorably to Nablico. In fact, up to March 1965 Nablico had disbursed approximately $162,000 in settlement of such claims and additional claims remain undetermined.

Plaintiff contends that the proxy statement, in addition to the above misstatements and omissions of material facts, was false, misleading and deceptive in that (1) it failed to inform Defiance's stockholders how the exchange ratio recommended by Defiance's Board was arrived at, i. e., through an independent appraisal which applied certain "timesearnings" multipliers to earnings figures, and then added a 25% premium for IIE's control of Nablico, taking into account certain disadvantages in Nablico's operations; and (2) it gave the erroneous impression, by comparing recent market prices of Defiance and Nablico shares, that the 1 to 4⅞ ratio of exchange was directly related to a comparison of those market prices when such was not the fact. If other material facts (noted above) had not been misstated or omitted, these items would not be of material significance. Although it would have been helpful to the stockholders to be informed of the fact that a 25% premium was included for IIE's control of Nablico in arriving at the recommended exchange ratio, it was unnecessary to furnish them with a copy of the Hayden Stone report or the details of that report, provided the facts disclosed had not been distorted or misrepresented. As for the second contention, the proxy statement did not create the false impression that the exchange ratio was directly related to the market prices of Defiance and Nablico stock, because the presentation of market prices of Defiance and Nablico shares was clearly limited solely to those two companies. The evil, however, lay in the failure to reveal in the same context that more than 10% of IIE shares had recently been sold in an arm's length transaction at $20.94 per share rather than bury such a vital fact in the tailend of an irrelevant portion of the long proxy statement.

Following the distribution of the misleading proxy statement to Defiance's stockholders, the exchange of IIE shares for Defiance shares was approved by more than than two-thirds of the issued and outstanding stock of Defiance at a meeting held on June 20, 1962. The shareholders of IIE unanimously accepted the exchange offer and tendered their IIE shares at the approved ratio of 4⅞ shares of Defiance stock for each share of IIE. As a result Defiance, in the summer of 1962, issued 487,502 shares of its Class B common stock in exchange for all of the outstanding shares of IIE. Of the Defiance shares thus issued, 375,857 shares were issued to Muscat, Huffines, Krock and their associates, with the result that the triumvirate increased their ownership of Defiance stock to 420,157 shares or 62.1% of its outstanding stock, which clearly represented voting control as compared with the working control theretofore possessed by them.

The gross unfairness to Defiance's stockholders of the exchange, and the materiality of the distorted and inflated Nablico earnings figures contained in the proxy statement distributed to Defiance stockholders for the purpose of inducing them to approve the exchange, is further evidenced by the fact that in November 1962 Huffines commenced arm's length negotiations with third parties (John B. Schary Company) for the sale of IIE's stock interest in Nablico, which was IIE's principal asset, leading to the execution of a sales contract on February 4, 1963, which was consummated by IIE's sale of its Nablico shares to the third parties for a price of $5,495,835, or $49.50 per Nablico share, as compared with Hayden Stone's evaluation of the Nablico shares as worth from $72.90 to $78.10 per share as the basis for its valuation of IIE in

connection with the Defiance-IIE exchange.[4]

Accepting Hayden Stone's valuation of IIE's assets other than its Nablico shares (which were its principal asset), and substituting the actual price realized by IIE of $49.50 per Nablico share, the aggregate net value of IIE's own outstanding stock was $40.58 per share rather than the $70.51 per share attributed to it by Hayden Stone as the basis for the defendants' recommendations to Defiance stockholders that resulted in approval of the exchange at the stockholders' meeting of June 20, 1962.

Although the parties have stipulated in the pretrial order that IIE's sale of its Nablico shares pursuant to the negotiations commenced by Huffines in November 1962 was "determined by arm's length negotiations between IIE and the purchaser," Redwood suggested in his testimony that IIE's sale of its Nablico shares was a forced sale arising out of Defiance's need for money. This opinion, however, is unsupported by any credible evidence.[5] The negotiations extended over a period of approximately three months, culminating in the February 4, 1963 contract. There was no decline in Nablico's business after March 1961, when Redwood submitted to Hayden Stone his "adjusted book value" figures for use in determining the value of the

Nablico and IIE shares. Furthermore, Huffines, the principal negotiator, testified that the negotiation for the sale of Nablico "was a very hard and arm's length negotiation of trying to get the best price on our part and the best price on his part."

After thoroughly reviewing the evidence the Court finds that the fair market value of IIE's Nablico shares on June 20, 1962, when Defiance's stockholders approved the Defiance-IIE exchange, was $49.50 per share and that the fair market value of IIE's outstanding stock on that date was $40.58 per share.

## CONCLUSIONS

This Court has jurisdiction over the person of defendants Defiance, Muscat and Huffines, and over the subject matter of the action.

■ Plaintiff has established a clear case of gross and deliberate fraud on the part of defendants Huffines and Muscat, knowingly participated in by Krock, in breach of their fiduciary duties to Defiance's stockholders and with the purpose and effect of profiting at the expense of its stockholders. It is difficult to conceive of more flagrant and callous breaches of trust on the part of corporate fiduciaries than those found here. At the very time when defendants were recommending to Defiance stock-

---

4. The February 4, 1963 contract (Ex. 21) called for a net price of $4,162,227 for sale of IIE's Nablico shares, consisting of (1) $3,900,872 cash; (2) the buyer's assumption of $585,000 in obligations plus accrued interest of $17,355; and (3) the buyer's non-negotiable two-year promissory note in the sum of $1,166,707, from which must be deducted (a) $516,-707 because the note was compromised for $650,000; and (b) $100,000, a reserve established for loss on certain real estate purchased by Defiance from Nablico pursuant to the contract. Adding to the resulting net price of $4,162,227 a cash dividend of $1,333,608, which IIE received from Nablico on July 18, 1962, results in a total purchase price received by IIE of $5,495,835 or $49.50 per share (based on 111,138 Nablico shares owned by IIE before a 100% stock dividend on June 14, 1962.)

5. For instance, Huffines' testimony that IIE was willing to sell for a lower price because of the "worsening of the litigation" instituted by Nablico policyholders, who had become "militantly aggressive" in their suits for dividends, is hardly consistent with the earlier statement in the May 28, 1962 proxy statement to Defiance's stockholders that "in the opinion of counsel, the claims are not justifiable." As for Huffines' testimony that the Texas Department of Insurance was requiring larger reserves, this step appears to have been precipitated by Nablico's distribution of a dividend of $1,333,608 on July 18, 1962, which is taken into account in arriving at the price of $49.50 per Nablico share.

holders the acquisition of IIE stock at a value of $70.51 per share, they were privately acquiring for themselves a very substantial block of that stock (10%) at $20.94 per share in an arm's length transaction with a seller fully acquainted with the facts, all with a view to turning the block over shortly to Defiance in exchange for Defiance stock worth $70.51 for each IIE share turned in by them to Defiance. Later they consummated this unconscionable transaction, realizing a profit of $520,832 at the expense of their stockholders.

As Defiance's directors and principal executive officers, Huffines and Muscat owed the fiduciary duty to make available to Defiance the opportunity to purchase the 10,507 shares of IIE stock at $20.94 per share. For their violation of that duty they are jointly and severally liable to Defiance for $520,832 (the difference between the value of the Defiance shares (at $14.49 per share) received in exchange for the 10,507 IIE shares ($740,848) and their cost of acquiring the 10,507 IIE shares ($220,016)) less $314,475 (the amount for which defendants are liable on Counts I and III with respect to these shares), or $206,357.

■■ Their liability extends not only to the 7,004 IIE shares acquired by them but also the 3,503 shares acquired by Krock. Just before selling the 10,507 shares to Krock, Griffith offered to sell the entire lot to Huffines, who wrongfully seized this corporate opportunity to acquire all 10,507 shares by purchasing 3,502 shares through Krock, a long-time joint venturer with Huffines and Muscat in various enterprises, including their acquisition of working control of Defiance and exercise of that control. Accordingly, Huffines is individually liable with respect to all 10,507 shares, regardless of the fact that he split with his partners, Krock and Muscat, the opportunity to acquire them. Furthermore, Huffines and Muscat are liable, jointly and severally with Krock, with respect to all 10,507 shares because the liability of fiduciaries who act together in breach of their fiduciary obligations is joint and

several, Irving Trust Co. v. Deutsch, 73 F.2d 121, 125 (2d Cir. 1934); Austrian v. Williams, 103 F.Supp. 64 (S.D.N.Y.), rev'd on other grounds, 198 F.2d 697 (2d Cir.), cert. denied, 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701 (1952), and Krock himself owed a fiduciary duty to Defiance not to convert its corporate opportunity to his own use. In September 1961 Krock was a "financial consultant" to Defiance and, although not then a director, his fiduciary obligation to Defiance arose from his joint participation with Huffines and Muscat in the exercise of control of Defiance.

"It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation." Southern Pac. Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099 (1919).

Accordingly, Huffines and Muscat, having acted jointly with Krock in breach of their fiduciary obligations, are responsible not only for their own breaches of trust, but also for that of their co-venturer, Krock.

■ Huffines and Muscat are likewise guilty of a violation of §§ 10(b) and 14 of the Securities Exchange Act of 1934 (third cause of action) in fraudulently misrepresenting material facts to Defiance's stockholders in the May 28, 1962 proxy statement, including the 1958 to 1960 earnings of Nablico, and in omitting from the proxy statement material facts that rendered it misleading. As a proximate result of their misconduct, Defiance stockholders approved the Defiance-IIE exchange at the ratio of 1 share of IIE stock for 4⅞ shares of Defiance stock, worth $70.51. The effect was to require Defiance and its stockholders to pay $70.51 per share for IIE shares worth $40.58, or an excess of $29.93 per share. Huffines and Muscat accordingly must be held liable for this excess amounting to $2,992,940.

Although actual knowledge is not essential to the establishment of a claim

based on § 14(a) of the Exchange Act, the Court concludes that Huffines and Muscat, two knowledgeable and experienced business executives in charge of Nablico's affairs, were aware of its true earnings. Both had acted together in the formation, control and disposition of numerous companies for many years, including Nablico. They were, respectively, Chairman of its Board of Directors and President, and had been in control of Nablico since 1958. Muscat had been responsible for the hiring of Redwood as a Vice-President and Controller in charge of the preparation of Nablico's financial statements, and Redwood's main contact during his employment before Nablico was disposed of in February, 1963 was with Huffines and Muscat. Redwood was the source of the financial data used by Hayden Stone and it was at Muscat's suggestion that Redwood spoke with a representative of Hayden Stone concerning methods to be used in the valuation of Nablico, including prior-year adjustments to statutory earnings figures. Furthermore, concerning the failure of the proxy statement to disclose that two of the policyholders claiming dividends had recovered judgment and that substantial amounts were involved in similar claims against Nablico, it is clear that Huffines and Muscat knew that Nablico had already lost one such suit and that additional claims in substantial amounts could be anticipated. Huffines stated that the matter of policyholder suits was considered and discussed with the Texas Insurance Department prior to June, 1962 and Muscat admitted that as early as June, 1962 he estimated the maximum liability on such claims to be $250,000, although no indication of the seriousness of these suits appears in the proxy statement. Muscat's testimony that he was told by counsel that the ad-

verse judgment resulted from counsel's failure to duly appeal the decision of a judge who "didn't quite understand the case" does not alter the fact that he and Huffines knew of the adverse judgment and of the probability of substantial additional claims, facts which should have been disclosed in the proxy statement.

■ Huffines and Muscat are liable for the excessive amount of $2,992,940 which Defiance was required to pay for the IIE shares for the additional reason that they acted in violation of their state-law fiduciary obligation to Defiance (first cause of action) by causing it to acquire all the stock of IIE, 77% owned by them and their associates, at an inflated price. It is no defense to this breach of fiduciary duty that Defiance's stockholders ratified the defendants' self-dealing transaction since that ratification, having been procured by fraud, is ineffective. Claman v. Robertson, 164 Ohio St. 61, 128 N.E.2d 429, 436 (1955).

"It would thus appear, both on reason and authority, that a disinterested majority of the shareholders of a corporation have the power to ratify directors' frauds *provided there is no actual fraud in either inducing or effecting such ratification.*" [6] (Emphasis supplied)

In accord: Berkwitz v. Humphrey, 163 F.Supp. 78, 93–94 (N.D.Ohio 1958).

■ Nor does the fact that Hayden Stone recommended the exchange ratio afford defendants any legal protection. That report was founded on substantially the same inflated Nablico earnings (furnished to it by Redwood) as those later used by the defendants in the Defiance proxy statement to induce its stockholders to approve the exchange. Furthermore, since Hayden Stone submitted its

---

6. Although it might be argued that the impact of defendants' fraud upon Defiance stockholders located in New York would lead New York courts, as a matter of policy, to refuse to apply Ohio law with respect to ratification of a self-dealing transaction, this Court holds that New York would follow Ohio law on this

issue. See Hausman v. Buckley, 299 F. 2d 696, 702 (2d Cir. 1962). In any event if New York law were applied, the stockholders' ratification would be ineffective, regardless of whether it was procured by fraud. Continental Securities Co. v. Belmont, 206 N.Y. 7, 99 N.E. 138 (1912).

report in June 1961, *it could not have had* knowledge of the arm's length transaction for sale of 10% of the IIE stock negotiated only a couple of months later at a price of $20.94 per share instead of the $70.51 recommended by the report.

*This most crucial information, coupled with more accurate earnings data, would undoubtedly have led Hayden Stone to reconsider and revise its report and recommendations.* Furthermore, both Huffines' and Muscat at the time when that sale was being negotiated took the position that the Hayden Stone report was of no significance and "that it couldn't be used for any basic pricing of the stock." Krock, an active member of the triumvirate, repeatedly discounted the report, stating that it "showed a grossly inflated value for the IIE stock," and that it contained "flaws." It was just such material "flaws" that rendered the proxy statement misleading.

For the same reasons even after appropriate weight is given to the submission of the material for the May 28, 1962 proxy statement to the SEC for review before circulation, such review does not serve to relieve defendants from their breach of fiduciary duty and their violations of §§ 10(b) and 14 of the Exchange Act of 1934. See Dunn v. Decca Records, Inc., 120 F.Supp. 1 (S.D. N.Y.1954). There is no indication that the SEC was aware, as were the defendants, of the inflation in the Nablico earnings figures used in the proxy solicitation material, and it is difficult to believe that if the SEC had in fact noted the reference, which is buried away at the tailend of an irrelevant section, to the recent arm's length sale of 10% of IIE's stock at $20.94 per share, it would have permitted the proxy material to be circulated without placing that vital information where it would be more likely to be noted by Defiance stockholders. We can only conclude that the SEC was misled and that it failed to note the burial of this vital information, which was not included in the initial draft submitted to it for clearance.

Demand by plaintiff that the Board of Directors of Defiance bring this action was not made. However, such a demand would have been futile because in October, 1962 when this action was brought Huffines, Muscat and Krock comprised three of the six-man Board of Directors and furthermore they and their associates owned more than a majority of the voting stock of Defiance. In view of this domination and control by Huffines, Muscat and Krock, plaintiff sufficiently complied with Rule 23(b), now Rule 23.1.

Accordingly, for all the reasons set forth herein, Defiance is entitled to judgment in the sum of $3,199,297. In view of the substantial profits reaped by defendants through their wrongdoing, interest is awarded at the rate of 6% per annum on $2,992,940 from July 13, 1962 when the Defiance-IIE exchange was consummated (first and third causes of action) and on $206,357 from September 6, 1961, when Griffith's shares were acquired (second cause of action). See Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y. 1967); Hey v. Cummer, 89 Ohio App. 104, 97 N.E.2d 702 (1950). Plaintiff is also entitled to recover from Defiance expenses necessary to the prosecution of this action, including reasonable attorneys' fees.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Settle order.

## APPENDIX A

§ 10(b). *Manipulative and deceptive devices*

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

§ 14(a). *Proxies*

"(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title."

Rule 10b–5, 17 C.F.R. 240.10b–5

"*Employment of Manipulative and Deceptive Devices*

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(a) to employ any device, scheme, or artifice to defraud,

"(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."