S. Hazard GILLESPIE, as Trustee and Receiver of Fifth Avenue Coach Lines, Inc., Surface Transit, Inc., and Westchester Street Transportation Company, Inc., Plaintiff,

v.

GRAY LINE CORP., Defendant.

No. 69 Civ. 4251.

United States District Court,
S. D. New York.

Sept. 3, 1970.

Strasser, Spiegelberg, Fried & Frank, New York City, for plaintiff.

Krieger, Chodash & Politan, Jersey City, N. J., Harold Krieger, New York City, for defendant.

## MEMORANDUM

BONSAL, District Judge.

Plaintiff, S. Hazard Gillespie, as Trustee and Receiver of Fifth Avenue Coach Lines, Inc. (Fifth), and of its wholly-owned subsidiaries, Surface Transit, Inc. (Surface) and Westchester Street Transportation Company, Inc. (Westchester), moves for summary judgment on Count I of the complaint for amounts alleged to be due Fifth by defendant Gray Line Corp. on open account, which remain unpaid after demand made therefor. Plaintiff seeks summary judgment in the amount of $1,307,562. representing advances shown on Fifth's books, and $448,-158. representing advances shown on the books of Fifth's subsidiaries Surface and Westchester and assigned to Fifth, together with interest at 6% per annum through December 31, 1969 which is calculated at $396,402.73, making a total of $2,152,122.73.

A detailed analysis of the parties and of some of the claims here in dispute appears in the opinion of Judge McLean in Securities and Exchange Commission v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3 (S.D.N.Y.1968).

## COUNT I

Plaintiff urges that there is no genuine issue as to the amount which is owed by defendant, pointing to his moving papers which "clearly show that, according to the books and records of Fifth and its subsidiaries, the amounts claimed are due and owing." Summary judgment, says the plaintiff, "is peculiarly suited to actions based on corporate books, records and accounts of long standing," citing Atlantic States Construction Company v. Robert E. Lee & Co., 406 F.2d 827 (4th Cir. 1969) and Lawhorn v. Atlantic Refining Company, 299 F.2d 353 (5th Cir. 1962).

However, during most of the period of the open accounts, both Fifth and defendant were controlled by a "triumvirate" which Judge McLean found used both corporations to further their own interests (289 F.Supp. at 11–13). Moreover, most of the open account indebtedness is based on the books and records of Fifth. In his opinion of July 26, 1968, Judge McLean stated, "In the short space of some seven months between October 1966 and May 1967, Fifth's record keeping deteriorated to a state bordering on chaos." (289 F.Supp. at 23). Under the circumstances, defendant could not on plaintiff's motion for summary judgment be expected to state with specificity its objections to specific items on Fifth's books. It could only do so after the testimony of those involved in the transactions is obtained. In view of the fact that Surface and Westchester were controlled by the same interests which controlled Fifth during the period in question, the testimony of those involved is also necessary with respect to the indebtedness shown in their books and records.

It is true, as plaintiff points out, that on several occasions the defendant's officers and attorneys have admitted that an open account indebtedness exists owing by defendant to Fifth, and that such admissions may be considered in a motion for summary judgment (Madeirense Do Brasil S/A v. Stulman-Emrich Lumber Co., 147 F.2d 399, (2d Cir.), cert. denied, 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982 (1945); Auto Drive-Away Company of Hialeah, Inc. v. Interstate Commerce Commission, 360 F.2d 446 (5th Cir. 1966)). However, in view of the factual background described by Judge McLean, these admissions are considered only as to the existence of an open account indebtedness, and not as admissions of the specific items which presumably appear on Fifth's books and records, aggregating $1,307,566. Nor do any admissions appear to have been made with respect to specific items in the open account indebtedness allegedly appearing on the books of Fifth's subsidiaries Surface and Westchester, totalling $448,158.

In view of Judge McLean's vivid description as to how the corporations were operated during most of the period of existence of the open accounts and his findings as to Fifth's books and records, there remain issues of fact such as the amount of specific advances and the purpose for which they were made, whether for the benefit of defendant or for the benefit of Fifth or some other corporation in the group, which preclude the granting of summary judgment.

## COUNT II

Plaintiff moves for summary judgment on Count II of his complaint for the unpaid purchase price on 26,080 shares of Gateway National Bank, sold to defendant at a price of $27.50 a share, and 200 shares of said stock sold to defendant at a price of $23. a share on or about January 9, 1967. Defendant made a part payment of $71,000, leaving a balance due, according to plaintiff, of $650,800., plus interest at 6% per annum, which calculated to December 31, 1969, amounts to an additional $118,528.92, making a total of $769,328.92. Defendant opposes the motion for summary judgment on the ground that the transaction was fraudulent. Defendant offers to rescind the transaction by returning the shares to plaintiff against return of the $71,000. paid six months after the date of the purchase. (In Count III of his complaint, plaintiff alleges that the sale was fraudulent as to Fifth, and as alternative relief, seeks rescission and an order declaring that Fifth has title to the shares free and clear of any interest on the part of defendant.)

At the time of the sale, plaintiff and defendant were related corporations. In his opinion, Judge McLean found that Defiance Industries, Inc. owned approximately 32% of BSF Company, a registered investment company. BSF owned 9% of Fifth. It also owned 20% of defendant, an inactive company which in turn owned 23% of Fifth. Surface, Fifth's wholly-owned subsidiary, owned 33% of defendant, and Fifth itself, at least until August 1966, owned 45% of

defendant. Hence, the combined holdings in defendant of BSF, Fifth, and Surface came to 98%, while BSF and defendant between them owned 32% of Fifth (289 F.Supp. at 11). It also appears that all these companies were controlled by the "triumvirate" described in Judge McLean's opinion.

With respect to the sale of the Gateway stock by Fifth to defendant, Judge McLean stated:

On December 15, 1966, Fifth entered into a written agreement with William C. Howell and others to purchase from them 26,080 shares of the common stock of Gateway National Bank of Chicago (Gateway) at a price of $27.50 per share, making a total of $717,200. The agreement was signed for Fifth by Ruffa as vice president. These shares constituted more than 60 per cent of Gateway's outstanding stock. The agreement provided for an immediate closing to take place on December 15 and further provided for an immediate meeting of Gateway's board of directors at which the board would elect Bolan and Brunner directors of Gateway.

The closing took place and Fifth acquired the stock. Thereafter Saxe, Bacon & Bolan decided that since Fifth already owned or was about to acquire a sizable block of stock in another national bank, Mercantile, federal laws (i. e., the Bank Holding Company Act, 12 U.S.C. §§ 1841, 1842) prohibited it from owning Gateway stock as well. Thereupon, on January 9, 1967, Fifth entered into a written agreement with Gray Line to sell the 26,080 shares of Gateway to Gray Line at $27.50 per share, the same price that Fifth had paid for it. This agreement was signed for Fifth by Krock as treasurer and for Gray Line by Ruffa as vice president. Gray Line, a company which, as previously related, had no business and no substantial assets except for its holdings of Fifth's stock, agreed to pay Fifth the purchase price of $717,-200. No time for payment was fixed.

No provision for security for payment was made.

Fifth delivered the stock to Gray Line. Gray Line did not pay for it.

On July 13, 1967, an amendatory agreement was made between Fifth and Gray Line, signed for Fifth by Murphy and for Gray Line by Ruffa. This agreement provided that Gray Line would pay the price by paying $71,720 in cash and by delivering ten promissory notes, payable semi-annually, for the balance of $645,480. Gray Line did not pay the cash and did not deliver the notes.

\* \* \* Thereafter, on December 19, 1967, a further amendatory agreement was entered into, signed for Fifth by Bolan and for Gray Line by one Goldstick. This document recited that Gray Line "is not in a position to make payment in accordance with the terms of the amendment of July 13, 1967." It went on to provide that Gray Line would deliver to Fifth the 26,080 shares of Gateway stock as security for the payment of the purchase price. It further provided that if Gray Line should sell the 26,080 shares, or any part thereof, it would pay Fifth the price out of the proceeds of the sale. (289 F.Supp. at 19)

Judge McLean continued:

Here at last we have a security, i. e., the stock of Gateway. Fifth sold this to Gray Line. Gray Line agreed to pay for it but thus far it has not paid. Was there a fraud practiced upon Fifth in connection with this sale?

Saxe, Bacon & Bolan handled this transaction. Ruffa was on both sides of it. He acted for Fifth in buying the stock from Howell and for Gray Line in buying it from Fifth. Krock signed the latter contract for Fifth. The reason for the transaction seems to have been an initial mistake on the part of Saxe, Bacon & Bolan in not appreciating that Fifth would run afoul of the Bank Holding Company Act if it owned both Gateway and Mercantile stock. But for this statute, presumably Fifth would have continued to hold the Gateway stock and there never would have been any transaction with Gray Line.

Gray Line was used as a receptacle for the stock. From one point of view it could be said that this was not a sale at all, but merely a transfer of this security from one pocket to another, so to speak. In fact, however, as well as in form, there was a sale, a transfer of title to the stock from Fifth to Gray Line. And it was a sale which was not in Fifth's best interest because Gray Line was merely a shell. Unless Gray Line were to sell its holdings of Fifth's stock, a most unlikely possibility under the circumstances, Gray Line obviously was in no position to pay for the Gateway. stock.

As far as appears, this transaction was not submitted to Fifth's board for approval. There was thus a failure to advise Fifth through its board of directors of material facts which had a bearing on whether or not this transaction should be approved. (Footnote omitted.) (289 F.Supp. at 39)

While Judge McLean was primarily concerned as to whether the sale was fraudulent as to Fifth, his findings indicate that it probably was fraudulent as to defendant as well. He states that defendant was used as a "receptacle for the stock," that defendant was "merely a shell," and that unless defendant "were to sell its holdings in Fifth's stock, a most unlikely possibility under the circumstances, Gray Line [defendant] obviously was in no position to pay for the Gateway stock." Moreover, the control aspect dwelt on by Judge McLean makes it clear that this was not an arms length transaction, but was entered into solely for the purpose of extricating plaintiff from a violation of the Bank Holding Company Act in owning both Gateway and Mercantile stock.

■ Under these circumstances, plaintiff is not entitled to summary judgment. Judge McLean stated that, "it was a sale which was not in Fifth's best interest because Gray Line [defendant] was merely

a shell." Indeed the court suggests that the sale be rescinded and the Gateway stock returned to Fifth, which is requested by way of alternate relief in Count III. Fifth should not be required to return the $71,000. received in part payment at this time, since it is clear that defendant is indebted to Fifth, the only issue being the amount. It should be sufficient if plaintiff deposits $71,000. in a special interest bearing account pending the final determination of plaintiff's claims against the defendant, so that it can be applied to the extent necessary in payment of defendant's indebtedness.

Plaintiff's motion for summary judgment on Counts I and II of the complaint is denied.

It is so ordered.