Seward N. LAWSON et al.

v.

**BALTIMORE PAINT AND CHEMICAL CORPORATION et al.**

Civ. No. 18497.

United States District Court,
D. Maryland.

May 31, 1972.

David Freishtat, Baltimore, Md., for plaintiffs.

Charles Yumkas, Baltimore, Md., for defendant Baltimore Paint.

William J. Kenney, Washington, D. C., for defendant Krock.

Seymour J. Kurtz, Chicago, Ill., for defendant Muscat.

Benjamin C. Howard and Daniel B. Leonard, Baltimore, Md., for defendant Huffines.

No appearance entered for defendant Cohn.

THOMSEN, District Judge.

This shareholder's derivative suit, seeking damages from former directors and officers of Baltimore Paint and Chemical Corporation (Baltimore Paint), has been tried before the court without a jury. The second amended complaint, on which the case went to trial, alleges that at some time prior to January 1, 1961, defendants Krock, Muscat and Huffines (the trio) formed a plan and conspiracy to acquire, directly or indirectly,

for their personal benefit, effective control of a "multitude of corporations", including Baltimore Paint; that pursuant thereto the trio and others, including defendant Cohn, who from time to time joined them in the conspiracy, acquired control of Baltimore Paint and caused it to make payments to them and to others in the form of unjustified salaries and other compensation, legal fees and reimbursement of expenses, and to engage in other transactions, wasting Baltimore Paint's assets.

Baltimore Paint was incorporated in Maryland and has its principal office and place of business in Baltimore. Federal jurisdiction is founded on diversity of citizenship and amount in controversy, which are not disputed. Venue in this court exists by virtue of 28 U.S.C.A. § 1401.

In a previous opinion, 298 F.Supp. 373, this court ruled on a number of points raised by motions to dismiss the first amended complaint and each cause of action alleged therein, motions to quash service of process, and other motions. The motions to quash were denied as to all defendants except Defiance Industries. The motions to dismiss were granted as to all causes of action against Shuford, one of the original defendants, and as to some causes of action against defendants Krock, Muscat, Huffines and Cohn. The basis for that ruling was that none of the plaintiffs became a shareholder of Baltimore Paint until December 1964, and some of the causes of action alleged in the first amended complaint were consummated before December 1964. See 298 F.Supp. at 375–377. Leave to amend some of the causes of action was granted.

The second amended complaint adopts most of the allegations of the first amended complaint and asserts five causes of action against Krock, Muscat, Huffines and Cohn, jointly and severally, based upon the alleged scheme:

First Cause of Action. Excessive salaries and bonuses to Krock, Muscat, Huffines, Cohn and others after December 1964, and stock options granted to Muscat and exercised by him.

Fourth Cause of Action. Excessive fees paid to Cohn's law firm and others.

Fifth Cause of Action. Improper payments to Krock for claimed expenses.

Sixth Cause of Action. Money paid by Baltimore Paint in 1966 in settlement of a suit against Baltimore Paint, Krock, Muscat, Huffines and Shuford, and for related attorneys' fees, arising out of the 1962 purchase by Baltimore Paint of the stock of Synkoloid Company, as part of the alleged scheme.

Seventh Cause of Action. Retention after December 1964 of the stock of BSF Company, alleged to have been purchased and retained as part of the scheme.

Cohn has not defended the suit. The remaining defendants, Krock, Muscat and Huffines, besides denying all of the charges, question whether plaintiffs are proper representatives of the corporation to bring the action. The facts with respect to standing will be set out in Part II of this opinion.

## I.

### Findings of Fact

1. From 1946 to 1958 the Shuger family owned and managed Baltimore Paint. In 1958 they sold their Baltimore Paint stock to American Dryer Company, receiving in return about $3 million cash and American Dryer stock. Albert, Leroy, Julius and Sewell Shuger also received long term employment contracts from Baltimore Paint. Albert was President and had charge of trade sales, Leroy was in charge of research and the technical aspects of production, Julius was the financial man, and Sewell oversaw the production, purchasing and industrial finishing departments.

2. Shortly thereafter American Dryer sold some of its Baltimore Paint stock to the public, but retained enough to have effective working control of Baltimore Paint. American Dryer subsequently merged with another corporation, and changed its name to Utronics Corporation.

3. In or about 1960 Krock, Muscat and Huffines initiated a series of transactions with the intention of obtaining actual or working control of various corporations, so that they might receive salaries and other compensation from such corporations and their subsidiaries.

4. Pursuant to that scheme the trio —with additional instrumentalists added and dropped from time to time as the program dictated—acquired control of various corporations. By mid-1961 the trio, their families and a corporation wholly owned by Muscat had acquired effective working control of Defiance Industries, Inc. (Defiance),[1] which controlled various other corporations.

5. Before July 27, 1961, Defiance acquired 52.9% of the voting stock of American Dryer (Utronics), which in turn owned 47.2% of the voting stock of Baltimore Paint, giving the trio effective working control of Baltimore Paint.

6. On July 27, 1961, Muscat, Huffines and Krock caused themselves to be elected directors of Baltimore Paint. Krock became Chairman of the Board, Chief Executive Officer and a member of the six-man Executive Committee. Muscat became Vice-chairman of the Board and a member of the Executive Committee. Huffines became Chairman of the Executive Committee. By June 1963, the Executive Committee had been reduced to four members: Muscat, Huffines, Krock and Joslin, all of whom were also directors of Defiance at that time. The salaries and bonuses paid to the trio over the years are set out in Schedule A, made a part of Finding 11, below.

7. In early 1962 Muscat, Krock and Huffines embarked on a series of corporate transactions designed to give them voting control, as well as working control of Defiance.

(a) In April 1962 the trio learned of the financial problems of A. Alex Shuford, an old friend of Huffines, arising out of Shuford's being an accommodation party to a note payable to a Denver bank by Clute Corporation, of which Shuford was a substantial shareholder and creditor. In March 1962 the Denver bank had called upon Shuford to pay the Clute note.

(b) Shuford was also the President and controlling shareholder of Shuford Mills, Inc., which in turn owned 14% of the stock of Insurance and Industrial Enterprises, Inc. (IIE). Muscat, Huffines and Krock, along with their respective families owned a controlling interest in IIE, and were substantial creditors of IIE.

(c) Capitalizing on their positions of control in Defiance, Baltimore Paint and IIE, the trio worked out a deal to relieve Shuford of his obligation to the Denver bank in return for his cooperation in a proposed exchange of stock between Defiance and IIE, which resulted in the trio and their families acquiring sufficient additional shares of Defiance to give them a majority of the voting stock of Defiance.

(d) The catalytic agent for this scheme was Baltimore Paint. Clute owned all the outstanding stock of Synkoloid Company, which manufactured paint and paste products. The trio caused Baltimore Paint to buy the Synkoloid stock from Clute.[2] Ignoring a resolution of the Clute board of directors that a specific portion of the proceeds of the sale be used for designed corporate purposes and the balance deposited to the credit

---

1. Then known as the Serrick Company. See Appendix.

2. No one from Baltimore Paint familiar with the paint business looked into the Synkoloid operation before the purchase. Synkoloid had no working capital at that time. Baltimore Paint loaned it about $1,480,000 from 1962 through 1969, of which some $400,000 has not been re-

paid. As a result of efforts by experienced Baltimore Paint personnel, Synkoloid has been made a moderately profitable subsidiary. At the meeting of the Directors of Baltimore Paint on May 18, 1962, at which they ratified the Synkoloid purchase, Shuford was made a director of Baltimore Paint and placed on its stock option committee.

of Clute pending a plan of reorganization, arrangement or other plan of rehabilitation,[3] the trio caused a substantial portion of the proceeds to be diverted to the payment of the note endorsed by Shuford. Shuford, in turn, cooperated with the trio in working out the IIE–Defiance stock exchange described in (c), above, which was consummated on July 13, 1962.

8. Having strengthened their control over Defiance and its subsidiary corporations, the trio schemed to enlarge their empire by obtaining control of the B.S.F. Company (BSF), an investment company which held controlling stock interests in various financial and industrial corporations.

(a) On July 12, 1962, Defiance and National Bankers Life Insurance Company, controlled by Defiance, purchased almost $700,000 of BSF stock at $8.50 per share from the Chamberlain Company of America (Chamberlain). Simultaneously, in a connected transaction, defendants caused Baltimore Paint to purchase from Chamberlain a paint company (Foreman Ford), which has been a losing enterprise for Baltimore Paint since the date of purchase.

(b) On July 20, 1962, Defiance and some of its controlled companies (Baltimore Paint, IIE, Utronics and National Bankers Life) purchased from ten banks approximately $1,300,000 of BSF stock at $8.50 per share; Baltimore Paint's share was $168,000, of which $20,000 was later sold to its Employee Retirement Fund.[4]

(c) From the end of July through August 20, 1962, the trio, along with Shuford, Joslin and Albert Shuger, purchased from others $1,000,000 of BSF stock.

(d) As a result of the foregoing transactions, the trio and their controlled corporations obtained working control of BSF and placed themselves, Shuford, Joslin and Albert Shuger, on its board of directors.

9. The trio caused Baltimore Paint to purchase Synkoloid and BSF stock for their own selfish interests, and not for the benefit of Baltimore Paint. Their attempted justifications for such uses of Baltimore Paint's cash were not convincing. Their claimed reason for Baltimore Paint's purchase of BSF stock was to expand its markets through American Hardware, purportedly controlled by BSF. After the BSF purchase, it was discovered that BSF did not in fact control American Hardware, and Baltimore Paint did not realize any additional business from BSF-controlled corporations.

10. (a) In the summer of 1963, Albert Shuger resigned as President and a director of Baltimore Paint. He was replaced in those capacities by Eugene O'Brien, an experienced paint man selected by the trio. At the same time they arranged for a New York law firm, Saxe, Bacon & O'Shea (the predecessor of Saxe, Bacon & Bolan, in which defendant Cohn was a partner), to replace the Baltimore law firm which had served as Baltimore Paint's general counsel.

(b) The operations of Baltimore Paint over the years in question were conducted by O'Brien and other key employees and officers located in Baltimore. The trio furnished no useful services to the company. They received monthly reports from O'Brien, and endorsed the practical decisions he made, except when O'Brien's decisions and recommendations conflicted with their desire to get as much cash as possible for themselves. In 1965 O'Brien recommended reasonable increases in compensation to key personnel, but Muscat directed that no increases be given to employees until the Foreman Ford operation (see Finding 8, above) became profitable. The trio, however, voted for a substantial increase in their own salaries.

---

3. The trio, who had been placed on Clute's board in order to consummate the Synkoloid sale, allowed the passage of this resolution at the insistence of the independent members of Clute's board.

4. Amounts have been rounded where exact figures are not material.

11. The net income of Baltimore Paint for the year ending December 31, 1960, the last fiscal year before the trio took over control of Baltimore Paint, had amounted to $489,681, on net sales of $14,790,072. During succeeding years the net sales gradually increased (with one or two relapses) to $22,296,085. But the net income decreased drastically below 1960 levels and did not reach $475,000 until 1966. From 1967 to 1969 it ran between $441,000 and $498,000. The principal reasons why the net income did not increase in some reasonable proportion to the increased sales were (a) the Synkoloid and Foreman Ford transactions, see Findings 7 and 8, and (b) the fact that first Muscat, Krock and Huffines, then Muscat and Krock, and finally Muscat alone, drew from Baltimore Paint in salaries and bonuses extremely large amounts, which increased steadily and substantially from year to year. See Schedule A, made a part of this Finding.

Schedule A

TOTAL SALARY AND BONUS RECEIVED BY MUSCAT, KROCK AND HUFFINES BY FISCAL YEAR

| Fiscal Year Ended | Muscat | Krock | Huffines |
|---|---|---|---|
| 12/31/61 | $ 5,000 | $ 5,000 | $ 5,000 |
| 12/31/62 | 18,083 | 18,083 | 18,083 |
| 12/31/62 | 29,000 | 29,000 | 29,000 |
| 8/31/64 (8 mos.) a | 19,333 | 19,333 | 19,333 |
| 8/31/65 | 39,010 | 39,010 | 39,010 |
| 8/31/66 | 74,325 | 74,325 | 35,000 b |
| 8/31/67 | 74,192 | 74,192 | 11,667 |
| 8/31/68 | 116,194 | 53,722 c | |
| 8/31/69 | 141,041 | | |
| 8/31/70 | 13,750 d | | |

The trio also caused stock options to be granted to them by Baltimore Paint during 1962. Neither Huffines nor Krock ever exercised their options. In 1968 and 1969, Muscat exercised the options which had been grantd him in 1962 and additional options granted him in 1966 and 1968, paying a net of $47,453.46 less than the market value of the stock on the respective dates of exercise.

a. 8 months only—because of a change of the fiscal year from the calendar year to a fiscal year ending August 31.

b. Resigned 7/6/66; retained to 12/31/66.

c. Resigned 2/20/68.

12. In November 1964 the trustee appointed by a bankruptcy court for Clute instituted suit against Baltimore Paint, Muscat, Krock Huffines and Shuford, claiming damages and other relief as a result of the transactions by which Baltimore Paint purchased the Synkoloid stock from Clute. See Finding 7, above. The complaint alleged that the trio and Shuford had violated their duties as directors of Clute, in that the principal purpose of the sale had not been to benefit Clute but to discharge Shuford's obligation as endorser on the Clute note held by the Denver bank; that the transaction had not been fairly explained to the stockholders of Clute in the proxy statement; and that this amounted to a violation of the Securities Exchange Act of 1934 by Baltimore Paint, entitling the Clute debenture holders to relief; that the purchase price for the Synkoloid stock had not been paid over to Clute as agreed; and that as a result of all the foregoing, the Clute trustee was entitled to various kinds of relief against Baltimore Paint, Muscat, Krock, Huffines and Shuford. The same law firms were chosen to represent Baltimore Paint and the individual defendants. The case was settled in December 1966 for $70,000. The legal fees amounted to $79,293. Both the settlement figure and the legal fees were paid by Baltimore Paint, with no contribution from the individual defendants.

13. Huffines resigned as a director and officer of Baltimore Paint on July 6, 1966. His resignation was accepted by the Board on July 7. He was kept on the corporation's payroll as a consultant until December 31, 1966, at a salary of $2,916.66 per month, but he performed no services during that period. Huffines' interest in Defiance was purchased by defendant Roy Cohn, who was elected to Baltimore Paint's Board of Directors.[5] In addition, Thomas A. Bolan, a partner in Cohn's law firm (Saxe, Bacon & Bo-

d. Ousted 12/22/69.

5. Huffines testified that he thought he was selling his stock to Muscat. In view of the court's findings and conclusions, that fact is immaterial.

lan) was elected Secretary of Baltimore Paint at an annual salary of $15,000; the law firm's retainer was increased from $12,000 to $24,000 per year.

14. The original complaint in the instant action was filed on June 23, 1967. The same Baltimore lawyer who first represented Huffines, Krock and Muscat in this suit was also engaged to represent Baltimore Paint and Defiance.[6]

15. On February 18, 1968, Krock resigned as a director and officer of Baltimore Paint. Two days later Joseph Keating, an associate of Muscat, was elected to the Board; Muscat became Chairman of the Board; non-salaried directors were given an annual fee of $2,000; Cohn became Vice-president in charge of legal matters at an annual salary of $18,000; and Muscat was voted a substantial salary increase. See Finding 11 and discussion in Part IV, below.

16. In August and September 1968 the services of Cohn and his associates to Baltimore Paint were terminated. On August 1, 1968, Bolan resigned as Secretary; on September 23, 1968, Cohn's salary as Vice-president was reduced from $18,000 a year to $1; and the retainer fee payable to Saxe, Bacon & Bolan (Cohn's law firm) was terminated. Keating replaced Bolan as Secretary. Meanwhile, on July 31, 1968, Albert F. Campbell, another associate of Muscat, had been elected to the Board of Directors.

17. In November 1969 El-Tronics, Inc. gained control of Defiance after a proxy battle with Muscat and his associates. El-Tronics thereby became the controlling shareholder of Baltimore Paint. On December 22, 1969, El-Tronics and new directors chosen by it succeeded in terminating the directorships and offices held by Muscat, his associates, and O'Brien. The new Board of Directors of Baltimore Paint authorized its present counsel to support plaintiffs' position in this case, which had been filed in 1967.

18. In the fall of 1968, when it became apparent that Muscat would have a proxy fight with El-Tronics for the control of Defiance and thereby of Baltimore Paint, he caused Baltimore Paint to give him a five-year contract of employment at a salary of $55,000 a year, plus a bonus.

II

*Plaintiffs' Standing*

■ In order to maintain a derivative action a plaintiff must have been a shareholder at the time of the transaction of which he complains, unless the share devolved on him by operation of law. Rule 23.1, F.R.Civ.P.; Eisler v. Eastern States Corp., 182 Md. 329, 35 A.2d 118 (1943); Bateson v. Magna Oil Corp., 414 F.2d 128 (5 Cir. 1969), cert. den. 397 U.S. 911, 90 S.Ct. 909, 25 L.Ed.2d 91 (1970). See McQuillen v. National Cash Register Co., 22 F.Supp. 867, 871 (D.Md.1938), aff'd 112 F.2d 877 (4 Cir. 1940), cert. den. 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450 (1940).

*Finding 19.* Plaintiff Lawson bought 50 shares of Baltimore Paint stock on December 26, 1964, and has been a shareholder continuously since that date, although he sold his original 50 shares on December 28, 1970. He now owns 600 shares. Plaintiff Peirce bought 100 shares on February 2, 1965, and has been a shareholder ever since, although he sold his original shares on May 25, 1971, after this trial began. He still owns 2,260 shares. Plaintiff Risk bought his first 500 shares on January 10, 1966; those shares were sold on October 21, 1969; he ceased to be a shareholder on October 28, 1971.

■ Defendants Muscat and Krock argue that to maintain such a suit as this a shareholder must have owned the same specific shares until or throughout the trial. No case supporting this contention has been cited or found, although there are cases which hold that a plaintiff must continue to be a shareholder

---

6. For subsequent changes in control of Baltimore Paint and Defiance, see Finding 17 and Conclusion D, below.

at the time of trial or throughout the litigation. Heit v. Tenneco Inc., 319 F. Supp. 884 (D.Del.1970); Gottesman v. General Motors Corp., 279 F.Supp. 361 (S.D.N.Y.1967). In each case the decision was based on state law. In Bateson v. Magna Oil Corp., supra, the plaintiff had owned stock at the time of the transactions complained of, and owned stock at the time of instituting suit, although there had been an intervening two-month period in which he had owned no stock. The Court said:

> " * * * Appellees' argument that appellant does not have standing to maintain this action loses sight of the purpose of Rule 23.1. That purpose is to prevent the federal court from being used to litigate purchased grievances or from becoming a party to speculative suits against corporations. Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 556, 69 S.Ct. 1221, 1230, 93 L.Ed. 1528, 1541. Certainly, it cannot be said that appellant is litigating a purchased grievance. He is not a speculative litigator. Therefore, it would exalt form over substance to hold that appellant did not have standing to maintain this stockholders' derivative action. Appellant should have his day in court." 414 F.2d at 131.

*Conclusion A*. Lawson has standing to maintain this suit for transactions after December 26, 1964, Peirce for transactions after February 2, 1965.[7]

*Conclusion B*. Their standing is not lost because they did not make a formal demand on the corporation to file suit against Muscat et al. before they filed this action. Their amended complaint alleges that it would have been futile to make such a request, and that allegation is clearly supported by the evidence. Muscat was still in control of Baltimore Paint when this suit was filed, and although he had had a falling out with one or more of the other defendants, it would have been futile to have expected him to cause suit to be filed against

himself and the other defendants on claims with respect to which he is being, or might have been, held liable jointly and severally as to some and individually as to others.

*Conclusion C*. Plaintiffs have also complied with the other requirements of Rule 23.1.

■ *Conclusion D*. Muscat's contention that there is some fatal collusion between plaintiffs' counsel and Defiance is frivolous. His argument is based upon the fact that after El-Tronics wrested the control of Defiance and Baltimore Paint from Muscat, El-Tronics authorized the new counsel for Baltimore Paint to cooperate with plaintiffs' counsel, and contributed to the expenses of maintaining this suit. El-Tronics now owns or controls a large percentage of the stock of Baltimore Paint, and it is proper for it to cooperate with plaintiffs' counsel.

## III

### Burden of Proof

■ The defendant directors bore a fiduciary relationship to Baltimore Paint and its stockholders, and the burden of proof is on them to establish the fairness, adequacy and equity of their transactions with that corporation. Indurated Concrete Corp. v. Abbott, 195 Md. 496, 74 A.2d 17 (1950); Bornter v. Leib, 146 Md. 530, 126 A. 890 (1924); Francis v. Brigham-Hopkins Co., 108 Md. 233, 70 A. 95 (1908); Teren v. Howard, 322 F.2d 949 (9 Cir. 1963); 3 Fletcher, Cyc. Corp. (Perm.Ed., 1965 Rev'd Vol.) § 1102.

Even if plaintiffs had the burden of proof, the weight of the credible evidence would justify the findings and conclusions herein.

## IV

### Salaries, Bonuses and Stock Options
### (First Cause of Action)

The background facts are set out in Findings 3 to 9. Findings 10(a) and

---

7. It is not necessary to decide whether or not Risk could maintain this suit.

(b), 11 (including Schedule A), 13, 15, 16 and 18 deal specifically with defendants' services and compensation. They show that the operations of Baltimore Paint were conducted by its officers and key employees in Baltimore, with little or no help from the trio. Muscat and Huffines did review with O'Brien at their office in New York the monthly financial reports, but the interest of the trio in Baltimore Paint was that of a Roman governor toward a conquered province. Despite the fact that the net income did not return to the 1960 level until 1969, they caused their own salaries to be increased repeatedly, from $12,000 each per year in 1961 to $35,000 each per year in 1965, then, upon Huffines' resignation in 1966, to $45,000 each for Muscat and Krock. Upon Krock's resignation in 1968, Muscat's salary was increased to $55,000 per year. The bonuses, paid each year from 1965 on, greatly increased the remuneration of Muscat and Krock, as will appear from Schedule A, a part of Finding No. 11. Their interventions into the affairs of Baltimore Paint were primarily for their own benefit, not for the benefit of the corporation, e. g., the Synkoloid and BSF transactions.

Krock and Huffines testified and attempted to justify their salaries. Muscat did not take the stand, but his attorney presented an argument. Cohn did not appear in the case.

The attempted justifications were substantially as follows—

(a) That the trio straightened out dissension among the officers shortly after they took over.

*Finding 20.* Albert Shuger resigned in 1963, and was replaced by O'Brien, see Finding 10(a); Leroy and Sewell Shuger continued in their jobs, and Sewell was given increasing responsibilities. At most, the trio did no more than directors who are not officers of a company ordinarily do.

(b) That the trio integrated the Merkin operation into Baltimore Paint.

*Finding 21.* The Merkin paint business had been acquired by Baltimore Paint and the plan for its integration into the Baltimore Paint operation had been formulated before the trio took over. That plan was adopted and carried out thereafter. Again, the trio did no more than directors who are not officers of a company ordinarily do.

(c) That they caused the unprofitable marine paint line to be discontinued.

*Finding 22.* This decision was made by O'Brien and simply approved by the trio. Again, the trio did no more than directors who are not officers of a company ordinarily do.

(d) That they made available Defiance personnel to aid Baltimore Paint.

*Finding 23.* The Defiance personnel prepared reports for the benefit of Defiance and its stockholders, including the trio. There is no credible evidence that they did anything to assist the Baltimore Paint operation.

(e) That the trio investigated other paint companies.

*Finding 24.* Perhaps they did, although the evidence is vague. The only two they added to the Baltimore Paint business were Synkoloid and Foreman Ford, which have held back the development of Baltimore Paint. See Findings 7 and 8.

(f) That they suggested possible customers to the operating personnel.

*Finding 25.* Huffines had a good business background, and Krock had wide connections. But there is no evidence that any lead suggested by any of the trio produced any business, nor that they attempted to follow up such leads.

(g) That the trio caused to be removed the senior officers of Baltimore Paint who had served before the trio assumed control.

*Finding 26.* Those officers had been selected by American Dryer before the trio acquired control of American Dryer through Defiance. The trio took over some positions and created new positions for themselves; but the working officers were either promoted from the Baltimore staff (e. g., Albert Shuger and Sewell Shuger) or hired from outside (e. g., Mann, the Treasurer and later Vice-

president, and O'Brien, who succeeded Albert Shuger as President).

(h) That Krock obtained valuable lines of credit for Baltimore Paint.

*Finding 27.* Baltimore Paint had adequate lines of credit with Baltimore banks. Krock caused these lines and accompanying deposits to be shifted to banks outside Baltimore which he wished to favor for his own purposes. Any increased lines which Baltimore Paint may have needed were caused by the drain on its cash resources as a result of the Synkoloid and Foreman Ford operations, the Clute Trustee's suit, the BSF stock purchase, loans by Baltimore Paint to another Defiance-controlled company, and the large salaries and bonuses taken out of the business by the trio. When word of the suits against the trio and Cohn became public, see n. 15, below, Krock's banks terminated their lines of credit and O'Brien was forced to obtain money elsewhere.

(i) That State Mutual Life Assurance Company loaned money to Baltimore Paint after investigating its operations, including salaries.

*Finding 28.* The testimony of the witness from State Mutual called by Krock was not persuasive. Krock's relationship with State Mutual was close. A per-scrutation of act and motive is not necessary.

(j) That the present counsel for Baltimore Paint resisted the contention of the Internal Revenue Service that the salaries, bonuses and other payments to the trio should be disallowed as deductions for income tax purposes.

*Finding 29.* Counsel opposed the assessment at the time it was proposed, asking that final action be postponed until the decision in the instant case.

■ Like agents in general, a director or other corporate officer must be loyal to his trust and must act in good faith. 3 Fletcher, Cyc.Corp. (Perm.Ed., 1965 Rev'd Vol.), § 990. In addition to certain specific statutory liabilities and penalties, a director may be liable to the corporation for the consequences of a breach of his fiduciary duty. Brune,

Maryland Corporation Law and Practice (Rev.Ed.1953) § 226, cited in Parish v. Maryland and Virginia Milk Producers Ass'n, 250 Md. 24, 75, 242 A.2d 512 (1968). Maryland has accepted "the general principle that an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a wilful and deliberate breach of his contract, may be denied compensation for his services." Shipley v. Meadowbrook Club, Inc., 211 Md. 142, 148, 126 A.2d 288, 291 (1956); St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 262 Md. 192, 218, 278 A.2d 12 (1971).

■ When an officer or director of a corporation has been found to have breached his fiduciary duty, the extent of recovery of salary and other compensation depends upon the circumstances. Where there has been a wilful breach of his duty, full recovery by the plaintiff has generally been allowed. See e. g., Wilshire Oil Co. of Texas v. Riffe, 406 F.2d 1061 (10 Cir. 1969), cert. den. 396 U.S. 843, 90 S.Ct. 105, 24 L.Ed.2d 92 (1969); Backus v. Finkelstein, 23 F.2d 357 (D.Minn.1927). Where, however, the conduct of the officer or director was less flagrant, and he had rendered some real service to the corporation, only a part of the compensation has been ordered returned. Richardson v. Blue Grass Mining Co., 29 F.Supp. 658, 670 (E.D.Ky.1939), aff'd 127 F.2d 291 (6 Cir. 1942); Teren v. Howard, 322 F.2d 949 (9 Cir. 1963).

■ *Finding 30.* Here, the trio committed a wilful and deliberate breach of their fiduciary duties to Baltimore Paint, pursuant to an elaborate scheme jointly embarked upon and carried out by them over a period of years. Cohn also committed a wilful and deliberate breach of his fiduciary duty.

*Conclusion E.* They should be denied the fruits of their scheme and required to return to the corporation all the money which they received as salary or bonus, or which they caused to be disbursed to others for their own purposes and not for the benefit of the corporation.

■ "The liability is joint and several where two or more directors participate in the wrongful acts." Fletcher, op. cit., § 1002, at p. 553. In Norte & Co. v. Huffines, 304 F.Supp. 1096, 1109 (S. D.N.Y.1968), aff'd 416 F.2d 1189 (2 Cir. 1969), the court said: "Furthermore, Huffines and Muscat are liable, jointly and severally with Krock, with respect to all 10,507 shares because the liability of fiduciaries who act together in breach of their fiduciary obligations is joint and several * * *." [8] See also Stopford v. Haskell, 147 F.Supp. 509, 510 (D. Conn.1957); Beard v. Achenbach Memorial Hospital Ass'n, 170 F.2d 859, 862 (10 Cir. 1948). Maryland law is in accord with the above statements. Pritchard v. Myers, 174 Md. 66, 77, 197 A. 620 (1938); Etgen v. Washington County Building & Loan Ass'n, 184 Md. 412, 418, 41 A.2d 290 (1945).

*Conclusion F.* Muscat, Krock and Huffines are jointly and severally liable for the salaries and bonuses paid to each of them from December 26, 1964, until July 7, 1966, when Huffines resigned as officer and director of Baltimore Paint.

*Finding 31.* Huffines had no part in the improper actions thereafter, except to receive a consultation fee of $17,500, payable over a period of six months, for which he did nothing. The fee was voted to him on July 7, 1966.

*Conclusion G.* Muscat, Krock and Huffines are jointly and severally liable for the $17,500 consultation fee paid to Huffines.

*Conclusion H.* Huffines is not liable for any of the salaries or bonuses paid after July 7, 1966. Fletcher, op. cit., § 996. See Brown v. Clow, 158 Ind. 403, 62 N.E. 1006 (1902).

*Finding 32.* When Huffines resigned and his stock was transferred to Cohn, and Cohn became a participant in the scheme, Muscat, Krock and Cohn arranged that Cohn should receive from Baltimore Paint and other companies controlled by them an amount equal to what Muscat and Krock were receiving from Baltimore Paint. The $9,000 salary paid to Cohn during Baltimore Paint's fiscal year ended August 31, 1967, was a part of that deal. There is no evidence that Cohn did anything to justify his salary. The fees to his law firm are discussed in Part V, below.

*Finding 33.* At the same time that Cohn became a participant in the scheme and was given a salary, his law partner, Thomas Bolan, was made an officer of Baltimore Paint at an annual salary of $15,000. He did nothing to earn his salary; the payment to him was part of the deal.

*Conclusion I.* For the reasons set out above, Krock, Muscat and Cohn are jointly and severally liable for the salaries paid Cohn and Bolan, as well as the salaries and bonuses paid to Krock and Muscat from July 7, 1966, until Krock resigned as an officer and director of Baltimore Paint on February 18, 1968.

*Conclusion J.* From February 18, 1968, until September 23, 1968, when Cohn withdrew from the scheme or was dismissed therefrom by Muscat (resulting in the termination of the salaries and fees to Cohn and Bolan), Muscat and Cohn are jointly and severally liable for the salaries and bonus paid Muscat and the salaries paid Cohn and Bolan during that period.

*Conclusion K.* After September 23, 1968, Muscat is solely liable for the salary and bonus paid to him.

*Finding 34.* After Huffines and Krock left, Muscat caused Joseph Keating, R. R. Scholz and Albert Campbell to be elected directors and/or officers of Baltimore Paint; they were paid from time to time salaries of $6,208, $3,500 and $2,666, respectively. There is no evidence that any of them did anything of value to Baltimore Paint to earn his salary. They were there to carry out Muscat's instructions.

*Conclusion L.* Muscat is liable for the salaries paid Keating, Scholz and Campbell.

8. The court is citing the *Norte* case for its legal ruling, not for any factual finding. See also discussion in Part VIII, below.

*Finding 35.* Two stock option plans were adopted by Baltimore Paint in 1962. Options were granted to Krock, Huffines and Muscat on August 3, 1962, and September 24, 1962. Neither Krock nor Huffines ever exercised their options. Muscat exercised his options on July 10, 1968, and June 18, 1969, respectively, at a total cost to him of $32,625 less than the market price on the dates of issue. Another option for 5,000 shares was granted to Krock on January 11, 1966, but he did not exercise it. On the same day, January 11, 1966, an option for 5,000 shares was granted to Muscat, which he exercised on June 18, 1969, at a cost to him of $17,500 less than the market price of the stock on that date. One other option, for 3,000 shares, was granted Muscat on July 31, 1968. He exercised that option under a plan permitting him to make payments over a period of 36 months. Only 1,328 of those shares have been issued to Muscat, for which he paid $2,671.54 more than the market price on the dates of issue. All of the options were granted to members of the trio pursuant to the scheme. Although the grants were ratified by a majority of the stockholders, the trio controlled a majority of the shares, and the evidence does not show that any of the plaintiffs herein voted in favor of any of the grants.[9]

The general principles applicable to stock options are discussed in 5 Fletcher Cy.Corp. (Perm.Ed., 1967 Rev'd Vol.) § 2143.1. See also McQuillen v. National Cash Register Co., 22 F. Supp. 867 (D.Md.1938), aff'd 112 F.2d 877 (4 Cir. 1940), cert. den. 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450 (1940). The controlling date for determining plaintiffs' standing to attack any gains from the exercise of the options is the date of the granting of the option, not the date of its exercise. Elster v. American Airlines, Inc., 34 Del.Ch. 94, 100 A.2d 219 (1953).

*Conclusion M.* Plaintiffs have standing to question only the options granted after December 26, 1964.

*Conclusion N.* Krock, Huffines and Muscat are jointly and severally liable for Muscat's $17,500.00 gain from the granting of the option on January 11, 1966, and in fairness should be credited with the $2,671.54 loss from the granting of the later option, resulting in a net liability of $14,828.46 on these items. They should not be liable for any dividends paid on the shares received by Muscat under the options, because they are being charged with pre-judgment interest on $14,828.46.[10]

## V

### *Legal Fees* [11]

#### (Fourth Cause of Action)

*Finding 36.* In 1966 Muscat engaged Hugh Mullen, Esq., of New York, as "house counsel," and divided his "salary" among Defiance, Baltimore Paint and Oklahoma Steel. Baltimore Paint paid him $11,000 during 1966 and 1967. He did nothing for Baltimore Paint.

*Conclusion O.* Muscat is liable for the $11,000 paid by Baltimore Paint to Mullen.

*Finding 37.* On Krock's instructions, Baltimore Paint paid $4,000 to Judge Frank Morrissey in 1967. Krock's counsel stated during the trial that Krock would "confess judgment" for this item.

*Conclusion P.* Krock is liable for the $4,000 paid Judge Morrissey.

*Finding 38.* When Huffines left, the retainer paid to Saxe, Bacon & Bolan was increased from $12,000 to $24,000 per year, as part of the equalization of total compensation between Muscat, Krock and Cohn. Saxe, Bacon & Bolan also received additional fees. The extent and results of their services are not clear; they handled at least sixteen matters. A Baltimore attorney also did some work for Baltimore Paint during this period.

---

9. Cf. Elster v. American Airlines, Inc., 34 Del.Ch. 94, 100 A.2d 219, 221 (1953).

10. Baltimore City Pass. R.R. Co. v. Sewell, 35 Md. 238 (1872), relied on by plaintiffs on the dividend point, is clearly distinguishable.

11. Except those discussed in Parts VI and VII, below.

*Conclusion Q.* Muscat, Krock and Cohn are jointly and severally liable for the $12,000 a year increase in the retainer ($1,000 per month) from July 1966 through January 1968, a total of $19,000. Muscat and Cohn are jointly and severally liable for a similar monthly amount from February 1968 through September 1968, a total of $8,000. Plaintiffs have not shown that the other fees were not earned.

## VI

### Krock's Expenses
### (Fifth Cause of Action)

*Finding 39.* Krock lived in Worcester, and was engaged in various business affairs there and elsewhere. In fiscal 1966 he charged Baltimore Paint with $14,000 for the purchase of a Cadillac automobile, in fiscal 1966–7–8 a total of $3,225.01 for its upkeep and incidental expenses and in fiscal 1968 $1,000 for a deposit on a second Cadillac. The cars were not used on Baltimore Paint business, and there was no justification for any of the items being charged to Baltimore Paint. The first car was finally turned over to Baltimore Paint, which sold it for $2,800. It does not appear that Muscat or Huffines approved the charges, or that they received any similar amounts.

*Conclusion R.* Krock is liable for $18,225.01 less $2,800.00, a net amount of $15,425.01, on account of these items.

*Finding 40.* Krock collected $9,883 from Baltimore Paint for travel and entertainment expenses. The treasurer of the company attempted without success to obtain adequate substantiation for these charges. Krock caused Baltimore Paint to pay $6,566 to attorneys for legal services rendered him. There was no justification for either of these items. Again, it does not appear that Muscat or Huffines approved these charges, or received any similar amounts.

*Conclusion S.* Krock is liable for $16,449 on account of these two items.

Plaintiffs seek $14,800 for "pension plan deductions disallowed" by the IRS for the years 1966 and 1967.

*Finding 41.* (1) These items were not claimed in the amended complaints; (2) the reason for the disallowance does not appear to have been based on the purchase by the Pension Fund of the BSF stock, as claimed by plaintiffs, but on the ground that the compensation to the trio was improper, and therefore that the payments to the Pension Fund based on such compensation were improper; (3) the income tax claims dealing with compensation are still open, pending the decision of this case; and (4) the status of those payments in the Pension Fund has not been shown.

*Conclusion T.* Any claim should be based on the amount of additional taxes, and not on the amount of deductions disallowed. Plaintiffs are not entitled to recover the $14,800 claimed for "pension fund deductions disallowed".

## VII

### The Synkoloid-Clute Problems
### (Sixth Cause of Action)

Plaintiffs claim that the trio should be required to reimburse Baltimore Paint for the $70,000 paid by it in settlement of a suit brought by the Trustee for the Clute Corporation [12] against Baltimore Paint, the trio and Shuford, arising out of the Synkoloid transaction, and $79,293 paid by Baltimore Paint for counsel fees in connection with that suit.

Plaintiffs' position is that the acts of the trio in connection with the purchase of the Synkoloid stock from Clute were made for the personal benefit of the trio, as set out in Finding 7, and amounted not only (1) to a breach of their fiduciary duty to Baltimore Paint, but also (2) a breach of the fiduciary duty owed by the trio to Clute, since the trio had arranged to be elected directors of Clute in order to put through the transaction in the way they and Shuford desired, for their personal reasons.

12. The basic facts are set out in Findings 7 and 12.

The trio raised several defenses: (a) that their conduct in the Clute transaction was not wrongful; (b) that the settlement of the Clute suit was in the best interests of Baltimore Paint; (c) that they were entitled to indemnification from Baltimore Paint for any expenses they were put to in connection with the Clute Trustee's suit; (d) that plaintiffs lack standing to press this claim; and (e) that the claim was not alleged in the second amended complaint.

### (a)

*Finding 42.* Based upon the facts set out in Finding 7, the acts of the trio in connection with the purchase of Synkoloid from Clute amounted to a breach of the fiduciary duty owed by the trio to Baltimore Paint. Those acts may also have amounted to a breach of the duty owed by the trio and Shuford to Clute, as alleged in the complaint filed by Clute's Trustee.

### (b)

*Finding 43.* The settlement of the Clute Trustee's suit was directed by the trio for mixed motives; (1) to reduce legal fees;[13] (2) to prevent possible judgments against the trio and Baltimore Paint in the Clute Trustee's suit;[14] and (3) to prevent the breaches of duty by the trio from being aired at a time when they had been sued or were about to be sued in other jurisdictions for alleged breaches of fiduciary duty and/or violations of the Securities Acts.[15]

The trio argue that they were and are entitled to the benefit of the "Indemnification of Directors" provision in Baltimore Paint's by-laws.[16] That by-law states, however, "that the provisions hereof shall not apply in any event where such director's actions or failure to act are the result of his (her) fraud or wilful misconduct."

*Finding 44.* The original Baltimore Paint-Clute transaction, upon which the Trustee's suit was based, was the result of the trio's wilful breach of their duty as directors of Baltimore Paint as well as an alleged wilful breach of their duty as directors of Clute.

*Conclusion U.* The trio were not and are not entitled to the benefit of the by-law.

13. Huffines testified that independent counsel had advised that the Clute Trustee was not likely to prevail, but that the legal fees would increase so greatly that a settlement of the case was desirable. The court does not accept this testimony at face value, because of the apparent violation of the trio's duty to Clute and Clute's stockholders as Clute directors; but a saving of attorneys' fees was one factor leading toward settlement of the Clute Trustee's suit.

14. The purchase of Synkoloid had required Baltimore Paint to lend and advance to the Synkoloid operation large sums of money. See n. 2, above. Synkoloid had been an unprofitable investment, but it was about to turn the corner. It was to the interest of Baltimore Paint that the Clute Trustee's suit not be lost.

15. See Norte & Co. v. Huffines, 222 F. Supp. 90 (S.D.N.Y.1963), appeal dismissed 319 F.2d 336 (2 Cir. 1963); 288 F.Supp. 855 (S.D.N.Y.1968), 304 F.Supp. 1096 (S.D.N.Y.1968), aff'd 416 F.2d 1189 (2 Cir. 1969); Securities and Exchange Commission v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3 (S.D.N.Y.1968), 308 F.Supp. 947 (S.D.N.Y.1970), aff'd 435 F.2d 510 (2 Cir. 1970); Gillespie v. Gray Line Corp., 317 F.Supp. 942 (S.D. N.Y.1970); Tanzer v. Huffines, 287 F. Supp. 273 (D.Del.1968), aff'd 408 F.2d 42 (3 Cir. 1969); 412 F.2d 221 (3 Cir. 1969); 314 F.Supp. 189 (D.Del.1970); 315 F.Supp. 1140 (D.Del.1970).

16. *"Article IX. Indemnification of Directors*
 "The corporation will exonerate, indemnify and save harmless each and every present and future director of the corporation from and against the costs (including reasonable attorneys' fees) of defending any suit or claim made against him (her) by reason of his (her) actions or failure to act while serving in his (her) capacity as such director and from and against any judgment (including Court costs) rendered against him (her) by reason of his (her) capacity as such director, except that the provisions hereof shall not apply in any event where such director's actions or failure to act are the result of his (her) fraud or wilful misconduct."

(c)

*Conclusion V.* Although the original Clute transaction was in 1962, before the December 1964 cut-off date for plaintiffs' standing, see Part II of this opinion, supra, the settlement of the Clute Trustee's suit and the payment of the attorneys' fees were after that date. Although they arose out of the earlier transaction, the defense of the Clute Trustee's suit and the settlement thereof, involving payments by Baltimore Paint for attorneys and in settlement, were after December 1964, and were part of a continuing wrong within the meaning of the applicable authorities.[17] Moreover, the Clute Trustee's suit was based primarily upon the wilful breach by the trio of the duty they owed Clute as members of its Board of Directors, and the payments which the trio required Baltimore Paint to make for the defense and settlement thereof constituted a new though related breach of their fiduciary duty to Baltimore Paint.[18]

(d)

In Paragraph 4 of the first amended complaint plaintiffs herein alleged, inter alia:

" * * * assets necessary to the successful conduct of the affairs of the several corporations, particularly operating capital, were diverted by said Defendants, Krock, Muscat, Huffines and Shuford, through exercise of their control for their personal advantages, particularly for the purpose of buying stock of other additional corporations in order to acquire control thereof and thereby extend the corporate empire to be depleted pursuant to the aforesaid plan and conspiracy."

The allegations of Paragraph 4 were incorporated in the sixth cause of action in the second amended complaint.

In the sixth cause of action in their first amended complaint plaintiffs alleged, inter alia, that the purchase of the Synkoloid stock in 1962, pursuant to the alleged plan and conspiracy, for the personal advantage of the trio, had caused a waste and diversion of corporate assets, requiring Baltimore Paint to incur additional expense of borrowings which would not otherwise have been necessary. Although it was alleged that the shares of Synkoloid had become worthless, it was not alleged that the retention of the investment, as distinguished from the original purchase, had been wrongful. Because the purchase of the Synkoloid stock had been made more than two years before December 1964, when any plaintiff herein first became a stockholder of Baltimore Paint, this court dismissed the sixth cause of action, with leave to amend. 298 F.Supp. at 376.

In the sixth cause of action in their second amended complaint plaintiffs added the allegation that Synkoloid had operated at a loss since its shares were acquired by Baltimore Paint, that its shares had continued to diminish in value, and reiterated the charges in the first amended complaint, summarized above.

It was not until plaintiffs submitted their third amended complaint that they specifically asserted a claim based upon the settlement of the Clute Trustee's suit. Defendants objected to the filing of the third amended complaint, and in order to avoid the delays which would have been involved as a result of the new claims and charges, plaintiffs agreed to go to trial on the second amended complaint.

Defendants take the position that the expenditures "incurred in defending and settling" the Clute Trustee's suit were not alleged and claimed in the second amended complaint.

---

17. 13 Fletcher, Cyc. Corp. (Perm.Ed., 1970 Rev'd Vol.) § 5982; Bateson v. Magna Oil Corp., 414 F.2d 128, 130 (5 Cir. 1969), cert. den. 397 U.S. 911, 90 S.Ct. 909, 25 L.Ed.2d 91 (1970).

18. Gluck v. Unger, 25 Misc.2d 554, 202 N.Y.S.2d 832 (S.Ct.N.Y.1960).

Plaintiffs answer that those expenditures were covered by the general allegations of the second amended complaint, which included the passage from Paragraph 4 of the first amended complaint, quoted above at the beginning of the discussion of this point; as we have seen that passage was incorporated by reference into the sixth cause of action in the second amended complaint.

■ *Conclusion W.* This court agrees that the allegations of the second amended complaint are broad enough to cover this claim.

Plaintiffs also contend that they are entitled to the benefit of Rule 15(b), F.R.Civ.P., which provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * * "

There was no express consent by defendants, but there was no real objection to the evidence offered by plaintiffs on this point until after the trial. After plaintiffs had offered most of their evidence on the point without objection, counsel for Krock asked to be provided with the correspondence file with respect to the Clute Trustee's suit and other files mentioned which he had not previously asked for, stating that it was his understanding "that the complaint would be restricted to the issues of the second amended complaint, and to the time frame of 1964 to 1966 or 1964 to current date". He added: "These are matters that were not an aspect of the complaint, and we have no particular reason to be familiar with the fact they would be made an issue of fact in these proceedings. As Mr. Freishtat says, there are a variety of items here that I

would request that we have the entire file on." He made no motion to strike the evidence already in. The court ruled that he was entitled to see the files and that the court would take a recess at some point in the case to allow him to do so. No other counsel objected to the evidence. Later, when defendant Huffines was on the stand, counsel for Krock examined him on this point, without objection from anyone.

*Conclusion X.* If it were necessary, the court would rule that there had been implied consent of the parties to try this issue. In view of Conclusion W, that ruling is not necessary.

*Conclusion Y.* Under all the evidence and circumstances it is fair, and this court rules, that Muscat, Krock and Huffines be held liable jointly and severally for one-half of the amount paid in settlement to the Clute Trustee and one-half of the attorneys' fees. Baltimore Paint should bear the other half.

## VIII

### *Retention of BSF Stock*
### (Seventh Cause of Action)

In the seventh cause of action in the first amended complaint, plaintiffs sought damages based on the purchase by Baltimore Paint of BSF stock at $8½ per share and its subsequent decline in market value. The court sustained defendants' motion to dismiss that cause of action with leave to amend, because the purchase had been made before December 1964, and no plaintiff had standing to challenge the purchase. 298 F.Supp. at 376.

In their second amended complaint plaintiffs seek damages based upon the retention of the BSF stock after December 1964.[19]

*Finding 45.* On December 26, 1964, the BSF stock traded on the American Stock Exchange at a high of $3⅛ and a low of $2⅞. From that time until control of Baltimore Paint was wrested from Muscat, the market value of the

---

19. The background facts are set out in Findings 8 and 9.

stock remained slightly above those figures, and at the time of trial it was still higher. Baltimore Paint suffered no loss by the retention of the BSF stock after December 26, 1964.

It is unnecessary to decide whether plaintiffs could recover if the BSF stock had continued to decline in value after December 1964. Cf. Nickson v. Filtrol Corp., 262 A.2d 267 (Del.Ch.1970); Newkirk v. W. J. Rainey, Inc., 31 Del.Ch. 433, 76 A.2d 121 (1950).

 *Conclusion Z.* Moreover, even if plaintiffs had standing to recover for any decline in the value of BSF stock, they have not proved in this case that the trio caused any such decline. Plaintiffs rely on collateral estoppel, based on statements contained in the opinions of the several courts in the cases cited in n. 15, above. There are several reasons why none of those statements can be considered as facts upon which this court can rely in this case; e. g., there was no identity of issues in most of them, and in Tanzer v. Huffines there was no final judgment on the merits. See State of Maryland for Use of Dickson v. Capital Air Lines, Inc., 267 F.Supp. 298 (D.Md.1967).

## IX

### *Pre-judgment Interest*

 *Conclusion AA.* An award of pre-judgment interest is necessary to compensate Baltimore Paint for the payments made by it over the years. It is fair under all of the circumstances to award interest at the rate of 6% per annum on each item for which recovery is allowed, calculated from the end of the fiscal year during which the item was paid, since in many instances the exact date of payment has not been proved. Robert C. Herd & Co. v. Krawill Machinery Corp., 256 F.2d 946 (4 Cir. 1958); St. Paul at Chase Corp. v. Manufacturers Life Insur. Co., 262 Md. 192, 234–236, 278 A.2d 12 (1971); At-

lantic States Construction Co. v. Drummond & Co., 251 Md. 77, 85, 246 A.2d 251 (1968); Norte & Co. v. Huffines, 416 F.2d 1189, 1191 (2 Cir. 1969).

*Conclusion BB.* It is also fair and proper under all the circumstances, see Finding 35, to allow interest at the rate of 6% per annum, accounting from June 18, 1969, on the net amount awarded as a result of Conclusion N, in Part IV.

Judgments will be entered accordingly. See Schedule B.

### *Attorney's Fees, Expenses and Costs*

Plaintiffs seek recovery from the trio of plaintiffs' attorney's fee and expenses, as well as the usual taxable costs.

 The court will follow the general rule that in derivative suits, when a plaintiff sues corporate officers for breach of their fiduciary duties, the corporation which benefits from the suit—not the directors charged with mismanagement—is directed to pay plaintiff's attorney's fee and expenses, except taxable costs. Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Kahan v. Rosenstiel, 424 F.2d 161 (3 Cir. 1970); Wright & Miller, Federal Practice and Procedure: Civil, § 1841, vol. 7A, p. 442 et seq.; 3B Moore, Federal Practice, ¶ 23.1.25 (2d ed. 1969); 6 Moore, op. cit. ¶ 5477 [2]. No such exceptional circumstances as existed in Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494, 500 (4 Cir. 1963), are present here.

*Conclusion CC.* Recovery from the trio of plaintiffs' attorney's fee and expenses, except taxable costs,[20] will not be allowed.

A hearing will be held at an appropriate time to determine what attorney's fee and expenses plaintiffs are entitled to recover from Baltimore Paint.

---

20. As to taxable costs, see Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143, 161–166 (D.Md.1968),

aff'd 415 F.2d 55 (4 Cir. 1969), cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed. 2d 101 (1970).